PHILADELPHIA WORLD HOCKEY
CLUB, INC.

v.

PHILADELPHIA HOCKEY CLUB,
INC., et al.

PHILADELPHIA HOCKEY CLUB, INC.

v.

John McKENZIE et al.

John McKENZIE

v.

PHILADELPHIA HOCKEY CLUB,
INC., et al.

SPORTS CENTREPOINT ENTER-
PRISES, LTD., et al.

v.

NATIONAL HOCKEY LEAGUE et al.

WORLD HOCKEY ASSOCIATION et al.

v.

NATIONAL HOCKEY LEAGUE et al.

Civ. A. Nos. 72–1661, 72–1807, 72–1902,
72–1906 and 72–1995.

United States District Court,
E. D. Pennsylvania.

Nov. 8, 1972.

See also 351 F.Supp. 457.

Pepper, Hamilton & Scheetz by Edward W. Madeira, Jr., Barbara W. Mather, Jeffrey C. Hayes, Charles J. Bloom, Philadelphia, Pa., for plaintiff.

Blank, Rome, Klaus & Comisky by Edwin P. Rome, and Richard P. McElroy, Philadelphia, Pa., and Covington & Burling by Herbert Dym, Harry L. Shniderman, James H. McGlothlin, Charles Lister and Alan K. Palmer, Washington, D. C., for Philadelphia Hockey Club, Inc., Boston Professional Hockey Association, Inc., Charles O. Finley and Company, Inc., Chicago Blackhawk Hockey Team, Inc., Detroit Hockey Club, Inc., California Sports, Inc., North Star Financial Corp., Le Club de Hockey Canadien, Inc., Madison Square Center, Inc., Pittsburgh Penguin Partners, limited partnership, St. Louis Blues Hockey Club, Inc., Maple Leaf Gardens, Limited, Vancouver Hockey Club, Limited, Niagara Frontier Hockey Corp., and National Hockey League, defendants.

Arthur Morse, Chicago, Ill., for Chicago Blackhawk Hockey Team, Inc.

Harold E. Kohn, P. A. by Harold E. Kohn, Steven E. Haberfeld, Aaron M. Fine, Arthur Kaplan, Philadelphia, Pa., for John McKenzie.

Jerome H. Torshen, Chicago, Ill., for Sports Centrepoint, and others.

Sommer, Tinkham, Barnard & Freiberger by William C. Barnard, Indianapolis, Ind., for Chicago Blackhawk Hockey Team, Inc.

HIGGINBOTHAM, District Judge.

## I.

## INTRODUCTION

In 1917, the National Hockey League was born with Montreal and Toronto as its only members. In 1924, Boston was added, followed in 1926 with Chicago, Detroit and New York. In 1967, Los Angeles, Philadelphia, Pittsburgh, California, Minnesota, St. Louis entered the League and in 1970 Buffalo and Vancouver. In 1972, Nassau (New York) and Atlanta joined this now famous League. Since 1966, the National Hockey League has received in excess of $36,000,000 for the sale of the rights to play major league professional hockey in their league. When in 1970 the National Hockey League admitted Vancouver and Buffalo, each of these two new clubs paid in excess of $8,000,000 for the acquisition of the minor professional league clubs in their locality and for dis-

tribution to National Hockey League clubs.[1]

Thus, from what in 1917 was a relatively minor sports attraction, the National Hockey League has skated into the 1970's to a position of substantial wealth, power, broad spectator interest, international recognition and many superstars, all crescendoing into huge profits for both its owners and players.

One writer observes:[2]

"What has happened is this: the intrinsic speed and excitement of hockey has made it the game of the second half of this century."

 Maybe in 1922 when the Supreme Court decided the baseball case, hockey was also, as Mr. Justice Holmes then described baseball, primarily an effort to give exhibitions with profits and interstate commerce contacts as mere incidentals. But today, as I review the instant record, hockey is primarily a multi-state, bi-national business, where the *fundamental* motive is the making of money. From its multiple interstate contacts it is a business in commerce subject to the federal anti-trust laws.[3]

Despite the thousands of words uttered on this record by all parties about the glory of the sport of hockey and the grandeur of its superstars, the basic factors here are not the sheer exhilaration from observing the speeding puck, but rather the desire to maximize the available buck.

Since 1971, the World Hockey Association (hereinafter referred to as WHA)[4] has attempted to enter major league professional hockey to become a real competitor in this field where the National Hockey League[5] (hereinafter referred to as NHL) has for so long held a total monopolistic position as the

1. *See* generally Findings of Fact 117 to 126, *infra*.

2. Hockey Illustrated, November 1972, Stan Fischler, p. 10.

3. The U. S. Supreme Court has never had to rule as to whether professional hockey is a sport operating in inter-state commerce and is therefore subject to the anti-trust law. Thus, hockey does not have the exemption status decreed more than 50 years ago for baseball in Mr. Justice Holmes' famous opinion—Federal Base Ball Club of Baltimore v. National League of Professional Baseball Clubs, 259 U. S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). I hold that hockey is not exempt from the federal anti-trust law, that it is subject to these laws just as are vaudeville shows, boxing, football, basketball, and golf. *See* H. B. Marinelli, Ltd. v. United Booking Offices, 227 F. 165 (S.D. N.Y.1914) (Vaudeville); United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955) ("legitimate" theatrical attractions); United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955) (Boxing); Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Haywood v. National Basketball Association, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (Mr. Justice Douglas, in his capacity as Circuit Justice); Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049, 1060 (C.D.Cal.1971); Washington Professional Basketball Corp. v. National Basketball Association, 147 F.Supp. 154 (S.D.N.Y.1956); Deesen v. Professional Golfers' Association, 358 F.2d 165 (C.A. 9 1966), cert. denied, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966). For an earlier case pertaining to hockey, *see* Peto v. Madison Square Garden Corp., 384 F.2d 682 (S.D.N.Y.1958); in Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728, the majority said: "Other professional sports operating interstate— football, boxing, basketball, and *presumably hockey* and golf—are not so exempt . . . ." from the federal anti-trust laws. (92 S.Ct. 2099, 2112 (1972).) (Emphasis added.)

4. Because we have a collage of cases wherein some of the plaintiffs are players who desire to play with the World Hockey Association and in other cases the plaintiffs are either World Hockey Association or National Hockey League teams, for purposes of convenience we will normally use WHA to refer to (1) World Hockey Association, (2) World Hockey Association Teams, and (3) players such as Bobby Hull and John McKenzie desiring to play with the World Hockey Association teams.

5. NHL refers to either the National Hockey League or the National Hockey League Clubs.

sole supplier of major league hockey competition. The basic issue is whether through their reserve clause, affiliation agreements, and market power dominance, the National Hockey League has violated the federal antitrust laws and if such a violation is found, whether the WHA is entitled to relief at this preliminary injunction stage.

After a careful review of this most detailed record [6] and the extensive briefs and proposed findings of fact, I find, for the reasons noted below, that for the National Hockey League players whose current contracts expired in September, 1972,[7] the National Hockey League violates the Sherman Act, Section 2,[8] in its efforts to preclude those players from joining WHA teams; accordingly the WHA is entitled to preliminary injunctive relief.

I would like to note my appreciation to all counsel for the most diligent manner in which they have pursued their discovery and litigation in this case. In fact, their performance has been a model for the entire legal profession as to the rational way in which able counsel can meet difficult problems in litigating with obvious vigor a preliminary injunction case where time, if not of the essence, is at least critical because any unnecessary delay by counsel or the court could create a substantial injury to some of the parties. If this case could be decided solely on the basis of the talent and diligence of counsel, the parties would be in perfect equipoise.

The original complaint was filed in Philadelphia on August 18, 1972. Since then, the parties have had extensive discovery, meeting with extraordinary dispatch difficult deadlines. They have filed detailed pre-trial memoranda and proposed pre-trial orders and amendments in support of numerous motions to remand, to dismiss, and for partial summary judgment. For one phase of this litigation pertaining to whether one case should be remanded to a Chicago state judge, we had extensive detailed arguments on the afternoon of September 27, 1972 and at 9:21 that evening, I dictated my opinion from the bench—from which no appeal was filed.

Though originally some phases of the case were argued as motions for partial summary judgment and motions to dismiss, on October 10, 1972 the parties agreed that the record was closed and that I " . . . may consider all of the matters on the preliminary injunction [aspects] which have been [also] submitted on behalf of the [motions for] summary judgment." Transcript, October 10, 1972, 148–9. The last exhibit was filed on October 24, 1972 pursuant to the court's request for additional information.

Since the record has been closed as to the preliminary injunction phase and the record might contain some material facts which are in dispute, I am declining to rule on the summary judgment motions. Instead I am deciding the case on the preliminary injunction phase with all of the facts (whether disputed or not) being resolved in the findings of fact, infra, and in the opinion. In accordance with Rule 52 of the Federal Rules of Civil Procedure, this entire opinion, including the discussion, constitutes my Findings of Fact and Conclusions of Law, and any proposed Findings of Fact and Conclusions of Law inconsistent with those not here found are hereby rejected.[9]

6. The 200 exhibits encompass more than 2,000 pages—and the briefs and proposed findings of fact exceed 500 pages.

7. See pages 507–508, infra, for analysis of the category of contracts which are held here to violate the Sherman Act.

8. See pp. 504–505, infra.

9. There are still perhaps a couple of open issues in this case which are not disposed of by this opinion such as the petition to remand to the Philadelphia state court. I will delay ruling on those few remaining open issues until a further pre-trial conference with all parties.

## II.

## FINDINGS OF FACT

### GENERAL FINDINGS AS TO JURISDICTION AND PARTIES

1. Five separate actions are consolidated before this Court in this proceeding. They are:

a. Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc. et al., C.A. 72–1661, complaint originally filed in this Court on August 18, 1972.

b. Philadelphia Hockey Club, Inc. v. John McKenzie, et al., C.A. 72–1807, removed from the Court of Common Pleas of Philadelphia, County on September 13, 1972, pursuant to 28 U.S.C. § 1441.

c. John McKenzie v. Philadelphia Hockey Club, Inc., et al., C.A. 72–1902, complaint originally filed in this Court on September 26, 1972.

d. Sports Centrepoint Enterprises, Ltd., et al. v. National Hockey League, et al., C.A. 72–1906, transferred from the United States District Court for the Northern District of Illinois pursuant·to 28 U.S.C. § 1404(a).

e. World Hockey Association, et al. v. National Hockey League, et al., C. A. 72–1995, transferred from the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a).[10]

2. Philadelphia World Hockey Club, Inc. (hereinafter "Philadelphia Blazers"), plaintiff in C.A. 72–1661, is a corporation organized under the laws of the State of New Jersey with its principal place of business in Philadelphia, Pennsylvania.[11]

3. Sports Centrepoint Enterprises, Ltd., (hereinafter "Winnipeg Jets"), plaintiff in C.A. 72–1906, is a corporation organized under the laws of the Province of Manitoba with its principal place of business in Winnipeg, Manitoba, Canada. (Complaint and Answer in C.A. 72–1906, ¶ 3a.)

4. Chicago Cougars Hockey Club, Inc., (hereinafter "Chicago Cougars"), plaintiff in C.A. 72–1906, is a corporation organized under the laws of the Province of Manitoba with its principal place of · business in Chicago, Illinois. (Complaint and Answer in C.A. 72–1906, ¶ 3b.)

5. John McKenzie, (hereinafter "McKenzie"), plaintiff in C.A. 72–1902, is an individual and a citizen of Canada, residing at Boston, Massachusetts (Complaint in C.A. 72–1902, ¶ 3; Complaint and Answer in C.A. 72–1807, ¶ 2.)

6. World Hockey Association, (hereinafter "WHA"), a plaintiff in No. 72–1995, is a non-profit corporation organized and existing under the laws of the State of Delaware, with its main office located in Santa Ana, California. WHA was formed in 1971 to operate a league of professional hockey clubs and to promote the interests of its individual member clubs. WHA has member franchises in cities and states throughout the United States and Canada. (Complaint in C.A. 72–1995, ¶ 3.)

7. The following plaintiffs in C.A. 72–1995 are all WHA franchise holders, and are corporations organized under the laws of the state or province indicated, with a place of business similarly indicated for each defendant:

a. Edmonton World Hockey Enterprises, Ltd., Alberta, McDonald Hotel, Edmonton, Alberta, Canada.

b. Cleveland World Hockey Association Club, Ohio, 3715 Euclid Avenue, Cleveland, Ohio.

---

10. Even though no answer has been filed by the defendants in this transferred action, pursuant to a stipulation of counsel, it was agreed that my decision on the motions in the other related actions pending before me would be dispositive of the issues raised by this suit.

11. The Philadelphia Blazers are also named as a defendant in C.A. 72–1807, along with James L. Cooper, President of the Blazers.

c. Houston Hockey Club, Inc., Ohio, San Houston Coliseum, 810 Bagby, Houston, Texas.

d. Los Angeles Sharks, Inc., California, 3939 South Figueroa Street, Los Angeles, California.

e. Midwest Saints, Inc., Minnesota, Metro Square, St. Paul, Minnesota.

f. New England Professional Hockey Club, Inc., Massachusetts, 17 Lobby Street, Boston, Massachusetts.

g. Metropolitan Hockey Club, Inc., New Jersey, Statler Hilton Hotel, 7th Avenue and 33rd Street, New York, New York.

h. Ontario National Hockey Teams, Inc., Ontario, P.O. Box 1358, Station B, Ottawa, Ontario, Canada.

i. Le Club de Hockey Les Nordiques, Inc., Quebec, Colisee de Quebec, Quebec 3, Quebec, Canada. (Complaint in C.A. 72–1995, ¶ 4.).[12]

8. National Hockey League, (hereinafter "NHL"), defendant in C.A. 72–1661, 72–1902, 72–1906 and 72–1995, is an unincorporated nonprofit association with its principal place of business in Montreal, Canada. From the time of its organization, the membership of the NHL has consisted of member clubs engaged in the staging of professional hockey games throughout the United States and Canada through a league of professional hockey clubs based on franchises covering specific geographical territories. (Complaint and Answer in C. A. 72–1661, ¶ 4; Exhibit P–3, Arts. I & II.)[13]

9. The following defendants in C.A. 72–1661, 72–1902, 72–1906 and 72–1995, are all corporations organized under the laws of the State or Province indicated immediately following each such defendant, with a place of business as indicated:

a. Boston Professional Hockey Association, (hereinafter "Boston Bruins"), Massachusetts. (Complaint and Answer in C.A. 72–1661, ¶ 5.)

b. Charles O. Finley and Company, Inc., (hereinafter "California Golden Seals"), holds the NHL franchise for Oakland, California. (Complaint and Answer in C.A. 72–1661, ¶ 6.)

c. Chicago Blackhawk Hockey Team, Inc., (hereinafter "Chicago Blackhawks"), Illinois, 1800 W. Madison Street, Chicago, Illinois. (Complaint and Answer in C.A. 72–1661, ¶ 7.)

d. Detroit Hockey Club, Inc., (hereinafter "Detroit Red Wings"), Michigan, 5920 Grand River, Detroit, Michigan. (Complaint and Answer in C.A. 72–1661, ¶ 8.)

e. California Sports, Inc., (hereinafter "Los Angeles Kings"), California, 3900 West Manchester Boulevard, P.O. Box 485, Inglewood, California. (Complaint and Answer in C.A. 72–1661, ¶ 9.)

f. The Hockey Club of Minnesota, Inc., (hereinafter "Minnesota North Stars") now known as Northstar Financial Corporation, holds an NHL franchise in Bloomington, Minnesota. (Complaint and Answer in C.A. 72–1661, ¶ 10.)

g. Le Club de Hockey Canadien, Inc., (hereinafter "Montreal Canadiens"), Quebec, 2312 St. Catherine Street West, Montreal, Quebec, Canada. (Complaint and Answer in C.A. 72–1661, ¶ 11.)

h. Madison Square Garden Center, Inc., (hereinafter "New York

---

12. Also named as plaintiffs in the transferred California case are the Blazers, Winnipeg Jets, and Chicago Cougars, movants in this proceeding and described more fully above.

13. The defendants named in Findings of Fact 8 and 9 are also counter-defendants in No. 72–1807.

Rangers"), holds an NHL franchise for New York, New York. (Complaint and Answer in C.A. 72–1661, ¶ 12.)

i. Philadelphia Hockey, Inc., (hereinafter "Philadelphia Flyers"), Philadelphia, Pennsylvania, The Spectrum, Pattison Place, Philadelphia. (Complaint and Answer in C.A. 72–1661, ¶ 14.)

j. Pittsburgh Penguin Partners, a Limited Partnership, (hereinafter "Pittsburgh Penguins"), hold an NHL franchise for Pittsburgh, Pennsylvania. (Complaint and Answer in C.A. 72–1661, ¶ 14.)

k. St. Louis Blues Hockey Club, Inc., (hereinafter "St. Louis Blues"), Missouri, 5700 Oakland Avenue, St. Louis, Missouri. (Complaint and Answer in C.A. 72–1661, ¶ 15.)

l. Maple Leaf Gardens, Ltd., (hereinafter "Toronto Maple Leafs"), Ontario, 60 Carlton Street, Toronto, Ontario, Canada. (Complaint and Answer in C.A. 72–1661, ¶ 16.)

m. Niagara Frontier Hockey Corporation, (hereinafter "Buffalo Sabres"), New York, Buffalo, New York. (Complaint and Answer in C.A. 72–1661, ¶ 17.)

n. Vancouver Hockey Club, Ltd., (hereinafter "Vancouver Canucks"), holds an NHL franchise for a hockey club in Vancouver, British Columbia. (Complaint and Answer in C.A. 72–1661, ¶ 18.)

o. Atlanta Hockey, Inc., (hereinafter "Atlanta Flames"), Georgia, 2 Forsyth Street, N.W., Atlanta, Georgia. (Complaint and Answer in C.A. 72–1661, ¶ 19.)

p. Nassau Sports, a Limited Partnership, (hereinafter "New York Islanders"), New York, 1 Old Country Road, Carle Place, Nassau County, New York. (Complaint and Answer in C.A. 72–1661, ¶ 20.)[14]

10. Clarence S. Campbell, (hereinafter "Campbell"), defendant in C.A. 72–1995 is an individual and President of the NHL and maintains a place of business in Montreal, Quebec, Canada. (Complaint in C.A. 72–1995, ¶ 8.)

11. Jurisdiction of the subject matter duly appears pursuant to 15 U.S.C. §§ 15 and 26 and 28 U.S.C. § 1337 and has not been challenged. Jurisdiction and proper venue of the defendants, except Atlanta and Nassau in C.A. 72–1661, is not contested. (*See* Complaint and Answer in C.A. 72–1661, ¶¶ 1 and 21.)

12. C.A. 72–1807 was removed to this Court pursuant to 28 U.S.C. § 1441(a) and (b). (Removal Petition in C.A. 72–1807, ¶ 11.)

13. This matter comes before the Court on motions for partial summary judgment and preliminary injunction submitted by Blazers in No. 72–1661, Centrepoint and Cougars in C.A. 72–1906 and McKenzie in C.A. 72–1807 and 72–1902.

## INTERSTATE TRADE AND COMMERCE

14. The various teams of the NHL transport players and equipment across state lines and the boundary between Canada and the United States in the course of playing their schedules of professional major league hockey games in the various cities in which NHL teams are located. (Defs.' Proposed Pretrial Order, ¶ 4(c), p. 22.)

15. Each NHL club stages hockey events, contracts with players and other individuals for their services, purchases equipment, contracts with television and radio stations, transports players and equipment, purchases and sells or ar-

---

14. Atlanta and Nassau were dismissed from C.A. 72–1661 by Order of Court pursuant to an agreement of counsel and they were not named as defendants in C.A. 72–1902. But they remain as named defendants in C.A. 72–1906 and counter-defendants in C.A. 72–1807.

ranges for the purchase and sale of refreshments at hockey rinks and carries on other activities in various parts of the United States and Canada. (Defs.' Proposed Pretrial Order, ¶ 2, p. 21.)

16. The NHL employs the instrumentalities of interstate commerce in the following respects:

(a) The NHL contracts with national network television stations for the broadcast of certain of its games (Exhibit P–27, Campbell dep., p. 148; Exhibit P–38, Wirtz dep., p. 36; Defs.' Proposed Pretrial Order, ¶ 4(a), p. 22.)

(b) Some of the NHL clubs sell tickets, employ agents and advertise in connection with the staging of some hockey events across state and national boundaries (Defs.' Proposed Pretrial Order, ¶ 4(b), p. 22.)

(c) The staging of hockey events by NHL teams requires interstate travel by them as well as communication in interstate commerce and movement of equipment in interstate commerce. (Defs.' Proposed Pretrial Order, ¶ 4(c), p. 22.)

## THE RELEVANT MARKET

17. The relevant market is major league professional hockey. (Findings of Fact 20–37, *infra.*)

18. The relevant geographic markets are the United States and Canada and the metropolitan areas in which the NHL teams are located. (Findings of Fact 20–37, *infra.*)

19. There is a sufficient disparity between major league professional hockey on the one hand and minor professional league and amateur hockey on the other to distinguish the former from the latter. (Findings of Fact 20–37), *infra.*

20. The average ticket price for NHL games is $5.22; for AHL games it is $3.07; for WHL games $2.47; and for CHL games $2.42. (Exhibit P–27, Campbell dep., p. 147; Exhibit P–71.)

21. Average paid attendance at NHL games is approximately 14,000; total paid attendance for the 1971–72 season was 7,906,000 for 536 games. The following is the total and average paid attendance for the 1971–72 season at minor league games:

| | Total Paid Attendance | Average Paid Attendance | No. of Games |
|---|---|---|---|
| AHL | 1,934,504 | 4,437 | 436 |
| WHL | 1,032,233 | 4,779 | 216 |
| CHL | 849,333 | 3,932 | 216 |
| Total Minor Leagues | 3,816,070 | | |

(Exhibit P–71; Exhibit P–27, Campbell dep., pp. 148–149).

22. Total attendance at NHL games was more than twice that of all three minor professional leagues combined, although the minor leagues played more games than the NHL. (Exhibit P–24, Allen dep., p. 225; Exhibit P–27, Campbell dep., pp. 148–49; Exhibit P–71.)

23. The popularity of major league professional hockey vis-a-vis its minor league counterpart is indicated by the fact that average 1969–70 season attendance in the NHL East Division was more than 100% of rated seating capacity. (Exhibit P–59). Chicago Blackhawks President William Wirtz testified that his team's games are typically sold out, but that in contrast the Blackhawks' Dallas minor league team draws only 2,500 in an 8,000 seat arena. (Exhibit P–38, Wirtz dept., p. 42.)

24. The NHL has entered into network television contracts, in both the United States and Canada, the proceeds of which are divided among the NHL member teams. It is, however, highly unusual for a minor league team to be able to secure such an agreement. (Exhibit P–27, Campbell dep., pp. 148, 152.) The Chicago Blackhawks have a local television contract under which its out of town games are shown in Chicago. The television station in Chicago pays the Blackhawks for the broadcast rights. No such arrangements can be made for the Dallas minor league team because "(t)here is no market for it". (Exhibit P–38, Wirtz dep. p. 37.)

25. Salaries paid NHL players are far higher than in the AHL. (Exhibit P–24, Allen dep., pp. 221–22.) Contracts offered to younger players often contain two salaries, one if the player is signed by his NHL team, a lesser sum if he is transferred to or remains with a minor league club. (Exhibit P–43; Exhibit P–33, O'Neill dep., pp. 89–91.) The average NHL player's salary in 1971–72 season was $24,000. For minor league players, salaries were typically $11,000 to $12,000. (Exhibit P–24, Allen dep., p. 222.)

26. There is no dispute among the witnesses that the presence of qualified players of major league professional caliber is essential to the successful conduct of major league professional ice hockey competition. (Exhibit D–2, Swados Aff., pp. 3–9; Exhibit P–38, Wirtz dep., pp. 27–28, 44–55; Exhibit P–27, Campbell Test. Senate, p. 545; Exhibit P–28, Cook dep., pp. 74–75.) Robert Swados, Vice President and Counsel of the NHL's Buffalo Sabres, states that highly developed playing skills are essential to the high quality of hockey demanded by major league fans. (Exhibit D–2, Swados Aff., p. 7, ¶ 5.)

27. Most amateur hockey players do not have sufficiently developed skills to warrant their inclusion on NHL team rosters. Such players usually require two to four years of minor professional league seasoning for major league competition. (Exhibit P–38, Wirtz dep., pp. 27–28; Exhibit P–33, O'Neill dep., p. 119.) Swados, of the Buffalo Sabres' organization, observes that only in "rare cases" is an outstanding amateur player placed immediately on the roster of an NHL team. Mr. Swados states:

"In most cases he would be assigned to a farm club for further development of his skill conditioning, elimination of his weaknesses, refinement of his team play or whatever special training the hockey department of the NHL club felt was required. Upon attaining the necessary skills and experience in team play, he would move up to his major league club." (Swados Aff., p. 12.)

28. The use of young amateur players as the sole basis for a professional hockey league team, in the words of the president of the NHL would mean "they (WHA) have got to spend at least another four years in developing them before they can do them one bit of good" and "if they do, they haven't got a good enough show." (Exhibit P–26, Campbell Senate, p. 545).

29. There are more than 50,000 amateur hockey players in Canada and the United States. In 1972, approximately 7000 Canadian players attained the age of 20 and were available in the NHL draft; of these, 152 were drafted by NHL clubs. By September 25, 1972, 45 of them had been successfully signed by the NHL clubs. (Exhibit D–126, O'Neill dep., p. 105; Exhibit D–2, Swados Affidavit, p. 14). The record does not reveal whether these 45 players immediately will play for an NHL major league team, or will first be assigned to the minor leagues.

30. Any and all of these 50,000 amateur players, including those subject to the NHL draft or actually drafted by an NHL club, but not successfully signed, are available to play in the WHA or any other league. As stated by Mr. Swados, of the NHL, "there is no provision of contract, constitution, by-law or statute that prevents any amateur player, whether or not drafted by an NHL club, from signing with the WHA or any other new league . . ." [Ex. D–2 (Swados), p. 14.] Mr. Davidson, President of the WHA, is also of the view that amateur players are contractually free to sign with any professional team that tenders them a contract. [Ex. D–134 (Davidson), p. 15.]

While there is apparently no legal bar which precludes the WHA's contracting with amateur players of any age, the Canadian government in regulating its sponsored amateur leagues would prefer that the professional leagues draft only amateurs who are over 20 years of age.

Even if the WHA observes the 20 year-old rule, there are many "junior hockey graduates", over the age of 20, who have had prior competitive experience by reason of the extensive play in the amateur leagues.

31. The World Hockey Association does intend to utilize some players from the minor professional leagues in order to stock their newly established clubs.

As stated by one of the two promoters of the WHA, the WHA "started off with the premise . . . that we would most probably not get too many players to join us from the National Hockey League after their contract period was up. We started off with that premise, so we looked at the basis that there was the Central League, the Western League, the International League, the Eastern League and the American League, all minor leagues, and the amateur leagues and the European leagues, and we felt that there was a great reservoir of players." [Ex. D–135 (Murphy), pp. 70, 79.] The "Player Personnel Executive" for the WHA, Mr. Steve Arnold (See Ex. D–19) gave Mr. Murphy, one of the two WHA promoters, "the feeling that there was plenty of good talent to draw from and that there was going to be a considerable reservoir of players to come from in the future." [Ex. D–135 (Murphy), p. 71.]

32. Financial considerations of the WHA further dictate that some players other than those of major league caliber will be signed. The WHA has advised its member clubs that:

"We would caution each of you that the expenditures for players could far exceed our budgetary estimates unless we all agree to a *firm* formula. This formula will provide for the stocking of each team under the following recommended structure.

"That each team include six graduating Junior Hockey League players, a minimum of six professional players from the Minor Leagues and five other professionals, hopefully National Hockey League players.

"It is felt that we can secure more than enough excellent Junior Hockey League players—future Super Stars —to build a foundation from. It is also felt that these players can be secured at an average cost of $10,000 bonus and a $15,000 salary. It would be to our advantage to sign these players to a multi-year contract." (Exhibit D–115)

33. Bobby Hull, apparently one of the "superstars" in professional hockey, has commented on the ability of junior hockey players:

"Some buffs consider the brand of hockey played in the Junior 'A' leagues more exciting if not better than that in the NHL. The reasoning is that every player knows he is being watched constantly by the NHL parent club and may be hauled upstairs at any time, if only to fill in for somebody who has been injured. This continued observation is supposed to make the Juniors play better. I doubt they do, regardless of the pressure, and I am certain a fan will see more finesse in the NHL than in the Juniors." (B. Hull, Hockey is My Game, 15–16 (1967)).

Bobby Hull has also stated:

"I would defy all but the hockey purist to find that much difference between the play in, say, the American Professional League and the NHL. Or for that matter between two of the top Junior 'A' clubs in Canada, though I know I have said there is a difference in play between the NHL and these clubs." (Id. at p. 22)

To the extent there is any inconsistency between the two statements, I adopt the former as a Finding of Fact and specifically reject the latter.

34. The WHA clubs have drafted 104 International Hockey League and Eastern Hockey League players, 105 college players and four known European players. (Exhibit D–3; Exhibit D–135 (Murphy) p. 80–A; Exhibit D–134 (Da-

vidson), p. 16; Exhibit D–87, p. 2; Exhibit D–126 (O'Neill), p. 103.)

## THE STRUCTURE OF PROFESSIONAL HOCKEY AND THE SUPPLY OF PROFESSIONAL PLAYERS.

35. Prior to the formation of the WHA in 1971, the NHL was the only major league professional hockey association in North America. (Exhibit P–34, Schmidt dep., p. 11; Exhibit P–73; Exhibit P–32, Mulcahy dep., p. 4–114.)

36. In addition to the NHL, there are three other professional hockey leagues in North America. These are the American Hockey League (AHL), the Western Hockey League (WHL), and the Central Hockey League, formerly the Central Professional Hockey League, (CHL), with a total of 24 teams (Exhibit P–71; Exhibit P–29 at 563–64; Exhibit P–34, Schmidt dep., p. 11; Exhibit P–35, Snider dep., pp. 13–15; Exhibit P–38, Wirtz dep., p. 24.). The best players are found in the NHL (Exhibit P–29, Eagleson Test. in *Flood*, pp. 549–50; Exhibit P–32, Mulcahy dep., pp. 4–114, 4–115), the next best in the American and Western Hockey Leagues, and the lowest level of professional players is in the Central Hockey League (Exhibit P–29, Eagleson, pp. 563–64.)

37. The International and Eastern Hockey Leagues are amateur or at best semi-professional leagues. William Wirtz (NHL) testified that the International Hockey League is an amateur organization "[t]hat does have professional players that have sat out for a couple of years and come back and want their amateur status reinstated." (Exhibit P–38, Wirtz dep., p. 23; Exhibit P–34, Schmidt dep., p. 11; Exhibit D–2, Swados Aff., p. 12.) And although they are sometimes used by NHL teams for assignment for development of their weakest players (*see* Exhibit P–24, Allen dep., pp. 226–29; Exhibit D–2, Swados Aff., p. 12), their players are generally less talented than those in the minor professional leagues.

38. The NHL requires that each of its member teams must have an affiliation with a "player development team". (Exhibit P–33, O'Neill dep. at 28; Exhibit D–2, Swados Affidavit at p. 17). Thus, at least 16 of the 24 professional minor league teams are owned or operated by or affiliated with NHL teams. All of the teams in the CHL are owned by NHL teams. (Exhibit P–25, Campbell *Flood* test. p. 574; Exhibit D–2, Swados Affidavit at 18.) C. S. Campbell stated that in addition to the teams owned by NHL members, ". . . there are almost an unlimited number of affiliations and loaning arrangements of various kinds." (Exhibit P–25, Campbell *Flood* test. p. 574.)

39. The National Hockey League is governed by a Board of Governors and a President selected by that Board, and each individual team defendant herein has a representative and a vote on the Board of Governors. (Exhibit P–3, NHL Constitution, Arts. 5.2, 61.).

40. The NHL By-laws provide that the Board of Governors will adopt a uniform Standard Player's Contract. The contract used during the 1971–72 playing season contained the following provision:

*Clause 17*

"The Club agrees that it will on or before September 1st . . . next following the season covered by this contract tender to the Players personally or by mail . . . a contract upon the same terms as this contract save as to salary.

The Player hereby undertakes that he will at the request of the Club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement.

(Exhibit P–4, NHL By-Laws, § 2.2(a); Exhibit D–1, Campbell Affidavit, Ex. D–4 attached thereto.)

Any player's Standard Player's Contract entered subsequent to March 29, 1972,

will contain the following new Clause 17:

"17. The Club agrees that it will on or before September 1st (August 10th, in the case of 'protected' players and those who played fifty NHL games in the preceding season) next following the season covered by this contract tender to the Player personally or by mail directed to the Player at his address set out below his signature hereto a contract upon the same terms as this contract save as to salary. The Player hereby undertakes that he will at the request of the Club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement, failing which, by arbitration under the Arbitration Agreement between the League and the NHL Players' Association dated March 29th, 1972." Ex. P–1, ¶ 17.

A reserve clause has been in effect since at least 1952. (Exhibit P–38, Wirtz dep. at p. 48)

41. On May 15, 1967, the NHL entered into an agreement with the Canadian Amateur Hockey Association (hereinafter "CAHA") and the Amateur Hockey Association of the United States (hereinafter "AHAUS"). (Exhibit P–8). Prior to this agreement, various NHL member teams had individually sponsored amateur clubs. (Exhibit D–2, Swados Affidavit at p. 15). The Pro-Amateur Agreement also replaced an earlier agreement of September 1, 1958, between the NHL and the CAHA, AHAUS and the International Ice Hockey Federation. (Exhibit P–8, Preamble, p. 2).

42. Unlike professional football and basketball, which can draw on an ample supply of talented players developed in competition at the college level in the United States at no cost to the member clubs of the professional leagues, the NHL has never had such a ready-made source of talent. Accordingly, it has invested millions of dollars to help support a system of amateur league and minor league hockey in Canada and the United States which will give youngsters an opportunity to play hockey and develop their hockey skills and which will thus also provide a source of potential players of major league calibre. (Ex. D–2 (Swados), pp. 7–8; Ex. D–126 (O'Neill), pp. 108–113).

43. During the period June, 1967 through June, 1971 alone, the NHL made grants totaling $5,493,000 to amateur hockey associations for distribution to and support of amateur hockey leagues throughout Canada and the United States. (Ex. D–2 (Swados), pp. 12–14.)

44. In addition to the NHL's support of amateur hockey, the NHL clubs have invested large sums for the development and support of professional minor league hockey clubs in Canada and the United States, many of which could not continue to operate without the subsidies provided by the NHL clubs. (Ex. D–2 (Swados), pp. 16–20.)

45. The willingness of the NHL clubs to invest so heavily in the development of hockey players in the amateur and minor leagues is based in large part on their belief that if a player developed through this system signs a contract with an NHL club that club will, because of the "reserve" clause, have the right to his services as a professional hockey player. (Ex. D–2 (Swados), pp. 7–9, 16.)

46. On May 1, 1968, NHL and the three minor professional leagues entered into a memorandum of agreement commonly referred to as the Joint Affiliation Agreement or "JAA" (Exhibit P–5 § 1). The JAA recites that its object is the ". . . furtherance of the mutual welfare and interests of the parties hereto and their member clubs in particular . . ." (Exhibit P–5, Preamble.)

47. The Constitution of the NHL gives each team the exclusive control over all professional hockey activities in its "home territory", defined as the city where each team is located and an area

of fifty miles from the city limits. (Exhibit P–3, Art. IV).

48. The "home territory" of each NHL team is preserved from minor professional league competition by the Joint Affiliation Agreement [Exhibit P–5, ¶ 31.] Simultaneously with the execution of the Joint Affiliation Agreement NHL teams acquired from the minor professional leagues territorial rights for Los Angeles, Pittsburgh and San Francisco-Oakland. [Exhibit P–5, ¶ 3, 32.]

49. Clause 17 of the Standard Player's Contracts in the AHL and CHL contain language identical in all material respects to that of Clause 17 of the NHL Standard Player's Contract prior to the March 29, 1972 addition of the Arbitration clause. [Exhibits P–6; P–7, P–42.]

Clause 17 of the Standard Player's Contract of the WHL is identical to the above, except that instead of stating "the club agrees . . .", it states "The Club shall have the option. . . ."

The similarities of phraseology and basic incorporation of Clause 17 in the Standard Player's Contract of the AHL, CHL, WHL, and NHL is the result of a common agreement, mutual understanding, and conspiracy by the NHL and its affiliated minor leagues to maintain a monopolistic position so strong that the NHL precludes effective competition by the entry of another major professional hockey league. Through the totality of many interlocking arrangements, including the Joint Affiliation Agreement, the Pro-Amateur Agreement, and Clause 17 in the Standard Player's Contract, the NHL perpetuates a conspiracy and combination with the intent to monopolize and. which monopolizes major league professional hockey. These concerted efforts were done not solely to maintain a high level of professional competition among the NHL teams, but rather the major reason was the desire to preclude others from ever having immediate access to the reservoir of players who could become part of another major pro-

fessional hockey league which could be a material and viable competitor to the NHL. In the words of Mr. Clarence Campbell, President of the NHL, part of the NHL's purpose was to make certain that the NHL would always be ". . . the only major professional hockey league operating from coast-to-coast in the United States or Canada." [Exhibit P–73.]

## THE NATIONAL HOCKEY LEAGUE BY-LAWS

50. Paragraph 18 of the Standard Player's Contract, provides that the player and the club are ". . . to be legally bound by the Constitution and By-Laws of the league." [Exhibit P–1, ¶ 18].

51. The By-Laws provide that no member club may derogate from or change the provisions of the Standard Player's. Contract without authorization of the Board of Governors. [Exhibit P–4, § 2.2(a)].

52. The By-Laws [Exhibit P–4, § 4] also establish "lists" relating to the right of NHL teams to control the services of professional players and provide the number of players which each team may maintain on such lists:

| | List | Number of Players |
|---|---|---|
| a. | Reserve List | 30 [Exhibit P–4, § 5] |
| b. | Goal Keepers Reserve List | 3 [Exhibit P–4, § 6] |
| c. | Negotiation list | 4 [Exhibit P–4, § 7.1] |
| d. | Voluntarily Retired List | |
| e. | Playoff Eligibility List | |
| f. | Sponsorship List (now obsolete) | |
| g. | Protected List | 20 [Exhibit P–4, § 16A.1] |
| h. | Inactive List | |

53. Pursuant to the By-Laws, the Joint Affiliation Agreement with the minor leagues and the Pro-Amateur Agreement, a Central Registry is maintained by the. NHL which receives and records all of the documents relating to the rights of NHL and minor league teams to various players and the transfer of amateur draft rights [Exhibit P–

4, § 9.9; Exhibit P–5, § 13; Exhibit P–8, § 14.]

54. Section 15 of the By-Laws forbids "tampering" with any player owned by any other club. "Tampering" as used in section 15 includes negotiating with, offering employment or discussing employment. It includes also the making of any public or private statement indicating a desire, interest or intention of acquiring the services of a player. Punishment for violation of this By-Law may include a fine of not less than $2,-000 but not more than $10,000 of which 50% is received by the offended club, prohibition of employment of the "tampered" person, and deferment by the offending member club of its choice in the draft proceedings. [Exhibit P–4, § 15]. Similarly, no member club may directly or indirectly negotiate with a player on another team's negotiation list. [Exhibit P–4, § 7.2].

55. Paragraph 14 of the By-Laws provides that each NHL team shall be liable for any act or omission of a minor league team owned, operated or affiliated by it which violates the By-Laws. The President of the NHL has the sole discretion to determine ownership, operation or affiliation. [Exhibit P–4, § 14.3].

56. The By-Laws, the Joint Affiliation Agreement and the Pro-Amateur Agreement establish the procedures for drafting players. [Exhibit P–4, §§ 16, 16A; Exhibit P–5, §§ 19, 22, 23.] There are four types of drafts:

 a. The Inter-League draft, between the NHL and the three minor professional leagues;

 b. The Intra-League draft, among NHL teams *inter se*;

 c. The "reverse" draft, by which players move from the NHL back to the minor leagues;

 d. The universal amateur draft.

57. The Inter-League draft is controlled by Section 16 of the By-Laws [Exhibit P–4, § 16], and the Joint Affiliation Agreement [Exhibit P–5, § 19].

Players selected in the Inter-League draft are placed on the reserve list of the selecting NHL club. [Exhibit P–4, § 16.6]. Not more than three hours following the Inter-League draft, each NHL team submits to the President a list of 18 players and two goal keepers it wishes to "protect". The "protected" lists are then circulated among the NHL member clubs as an offer to sell for $40,000 any "unprotected" professional or amateur player over the age of 22, on the club's reserve list (other than a first year professional). [Exhibit P–4, § 16A.3]

58. The Universal Amateur Draft is conducted pursuant to By-Law 16B and the Pro-Amateur Agreement. The By-Laws provide that "no player shall be exempt from such right of selection in the year in which he is eligible for claim." [Exhibit P–4, § 16B.2(b)]. Conversely, the Joint Affiliation Agreement prohibits any professional team from dealing with a player before he has passed through the Universal Amateur Draft. [Exhibit P–5, § 15(c)]. Selected players are placed on the selecting club's reserve list as "unsigned draft choices", which gives the selecting club the exclusive right to negotiate with such players. [Exhibit P–4, § 16B.-5(a)]. The selecting player may be held on the selecting club's reserve list so long as that club offers him employment in the NHL for a minimum of $10,000 per year or in the minor league for a minimum of $5,000 per year. [Exhibit P–4, § 16B.5(b)].

59. Payment to the amateur associations for selected players is set out in the By-Laws [Exhibit P–4, § 16B.6] and Pro-Amateur Agreement [Exhibit P–8, ¶ 18] as follows:

 a. $3,000 for each player selected in the Universal Amateur draft.

 b. An additional $3,000 if such player is signed by an NHL team.

 c. $4,000 if in his first year under a Standard Player's Contract, such player plays in 25 or more NHL games.

Recently, these amounts have been amended. [Exhibit D–2, Swados Affidavit, at p. 13.]

60. Any player under contract or reserved by a member who, without permission, plays for any other league or organization may be expelled or suspended as may a player refusing to sign a standard player contract containing an arbitrator's award. [Exhibit P–4, § 17.-5] The President of the league may prohibit the employment of any person by any member club if in his opinion such employment would be "prejudicial to or against the welfare of the league". [Exhibit P–4, § 18].

61. In addition to establishing the waiver price ($40,000) for NHL players and minimum salary levels for drafted amateurs ($10,000 in NHL, $5,000 in the minors), the By-Laws provide that no member shall pay or offer to pay its players any bonus or other reward which would be a special inducement over and above the contracted salary [Exhibit P–4, §§ 16A.7, 16B.5(b), 25.3; Exhibit P–38, Wirtz dep. p. 15].

THE PRO-AMATEUR AGREEMENT

62. The Pro-Amateur Agreement recites that the NHL is contracting on behalf of its associated and affiliated minor professional leagues, and the Joint Affiliation Agreement confirms that authority. [Exhibits P–8, p. 1; P–5, ¶ 28].

63. The NHL agrees to recognize the CAHA and AHAUS (hereafter "amateur associations") as the "sole and exclusive governing bodies of amateur hockey within their respective territorial and constitutional spheres . . ." and agrees that ". . . in all matters relating to amateur hockey and its relations with professional hockey . . ." the NHL will deal only with the amateur associations. The NHL also agrees to notify the amateur associations if it becomes aware of the possibility that a professional hockey club might be entering an amateur associa-

tion's territory, and if any amateur group seeks recognition as a professional league, application for such change in status would be first submitted to the amateur associations. [Exhibit P–8, ¶ 2].

64. The amateur associations acknowledge that the NHL and its affiliated and associated minor leagues ". . . are the sole and exclusive governing bodies of professional hockey in Canada and the United States of America . . ." and agree that ". . . in all matters relating to professional hockey and its relations to amateur hockey . . ." the amateur associations will deal only with the NHL. [Exhibit P–8, ¶ 3].

65. The amateur associations and the professional leagues agree to recognize each other's suspensions in a manner similar to the reciprocal recognition of suspensions contained in paragraph 26 of the Joint Affiliation Agreement. The effect of these agreements is to preclude a suspended player from any participation in organized professional or amateur hockey. [Exhibits P–8, ¶¶ 4, 5; P–5, § 26].

66. The amateur associations also acknowledge that the Standard Player's Contract, the negotiation claim and the unsigned draft claim will be the ". . . only officially recognized relationships in existence and use . . ." by the NHL and minor professional leagues [Exhibit P–8, ¶ 6], and that a player will be considered a "professional" only when he has signed a Standard Player's Contract [Exhibit P–8, ¶ 9]. The recognition of the Standard Player's Contract, the negotiation nomination and unsigned draft claims are supplemented with the recognition by the amateur associations of the various lists employed by the four professional leagues. [Exhibit P–8, ¶ 17].

67. The NHL, CAHA, and AHAUS agree that ordinarily no amateur player may be a "professional" unless he has reached his 20th birthday by December

31–January 1 of that season. [Exhibit P–8, ¶¶ 10, 11].

68. The NHL and the amateur associations agree to establish a Joint Development Committee to oversee liaison between the groups and that the NHL will subsidize the amateur associations, and make certain payments also specified in the NHL By-Laws [Exhibit P–8, ¶¶ 17, 18] for players drafted in the Universal Amateur Draft.

69. The Pro-Amateur Agreement also recites procedures by which a professional player seeking to be reinstated as an amateur must obtain permission of either the club with whom he was affiliated or the Joint Development Committee. [Exhibit P–8, ¶ 16].

70. The parties agree that they and their respective clubs will not "tamper" with each other's players. [Exhibit P–8, ¶ 16; see, Finding 54, *supra*.]

## THE JOINT AFFILIATION AGREEMENT

71. The NHL Constitution and By-Laws are subject to § 29(a) of the Joint Affiliation Agreement:

"(a) Each league, party to this agreement, is free to adopt such Constitution and By-Laws and League Rules or Regulations as it may see fit, provided always that nothing in such Constitution, By-Laws, Regulations or Rules shall conflict with this agreement while it is in force."

72. Under the Joint Affiliation Agreement each NHL member is permitted to protect 37 players, including players under Standard Player Contracts, not more than three goalies, and four negotiation nominees or unsigned draft choices. AHL and WHL clubs are entitled to protect thirty-one players, CHL clubs are entitled to protect thirty players. [Exhibit P–5, § 2].

73. Protection is recognized by the four professional leagues only if the player in question is under a Standard Player Contract. [Exhibit P–5, § 3]. Paragraph 3 of the Joint Affiliation Agreement specifies the Standard Player's Contract and registration of draft claims and negotiation nomination and states: "No other forms of agreement will be recognized or acted upon for the purpose of registering the rights to the services of any player upon the reserve list of any club." [Exhibit P–5, §§ 3, 12e].

74. Section 12(d) of the Joint Affiliation Agreement provides:

"Every professional player must sign a Standard Player's Contract in the form recognized by the league in which he plays, which contract shall be filed with the Central Registry Bulletin. Such contract shall not be modified by any deletion therefrom or by the addition of any provision thereto which has the effect of derogating from the printed contract in any manner whatsoever."

75. Under Section 5(a) and (b) each league agrees to "acknowledge and respect" the negotiation nominees or negotiation claims of the member teams in each league to a maximum of 4 such nominations for NHL clubs, three for AHL and WHL clubs and two for CHL clubs. The parties also agree that "a player whose name has been validly placed on any of the club or league lists hereinbefore described shall not be placed on any list of any other club in any league." [Exhibit P–5, §§ 5(a) and (b), 8(a)].

76. The Joint Affiliation Agreement recognizes and refers to the Pro-Amateur Agreement, provides that the age limit for competition in the junior category of amateur competition in the CAHA and AHAUS shall be 20 years [Exhibit P–5, § 15(a)], and establishes interleague rules governing the conduct of the Universal Amateur Draft. [Exhibit P–5, §§ 15(b), 22]. Similarly, the Joint Affiliation Agreement also establishes the procedures for the Inter League draft, one of the methods by which players are transferred from the minor professional leagues to the NHL [Exhibit P–5, § 19, See Exhibit P–33,

O'Neill Dep. at 29], and the "reverse draft" by which the minor leagues may draft players from NHL teams. [Exhibit P–5, § 23]. Section 20 provides that "[a] draft claim shall be considered as an actual purchase of the player drafted and subject to the normal rules governing purchases." Conversely, Section 23 provides that, by selecting a NHL player, the selecting minor league in the reverse draft becomes the owner of the right to the services of the player claimed. [Exhibit P–5, §§ 20, 23(i)].

## CLAUSE 17 OF THE NATIONAL HOCKEY LEAGUE STANDARD PLAYER'S CONTRACT

77. Since at least 1958 the NHL Standard Player's Contract has contained the following language:

"The player hereby undertakes that he will at the request of the club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement . . ." [Exhibit D–1, Affidavit of Clarence Campbell, especially Exhibits D–1 through D–5 attached thereto.]

78. In 1969 certain provisions of the NHL Standard Player's Contract came under severe criticism from Task Force on Sports for Canadians, including the reserve clause which is described as giving the Club the "right to require [a player under contract] to give his services indefinitely and wholeheartedly to the Club." The Report concludes:

"The Task Force cannot approve of this reserve clause. We recommend that steps be taken, if necessary by legislation, to require its deletion." [Exhibit P–68 at 35.]

79. R. Alan Eagleson, Executive Director of the NHL Players' Association, testified in 1970 in Flood v. Kuhn that:

"[The reserve clause] is considered by me, and I am sure by most, to be simply a lifetime option clause and that a player once he signs the con-

tract, since that is the standard contract of the league, signs with a team for life." [Exhibit P–29, Eagleson *Flood* at p. 550.]

80. On June 28, 1972, Mr. Eagleson testified before the Senate Commerce Committee that the nature of the reserve clause had not changed in the intervening two years. He stated:

"There is no way that the players in the National Hockey League can accept the position [the reserve clause] under the present circumstances, namely, *lifetime option* on a player's services." [Exhibit P–30, Eagleson Senate at p. 507 (Emphasis added).]

81. Charles W. Mulcahy, Jr., General Counsel and Vice-President of the Boston Bruins, on September 30, 1972, agreed that the reserve clause is a perpetual option. [Exhibit P–32, Mulcahy dep. at p. 2–173, p. 3–38.] In addition, William Wirtz, President of the Chicago Blackhawks, concurs in the view that the reserve clause constitutes a "continual option clause". [Exhibit P–38, Wirtz dep. at p. 49.]

82. In his 1969–1970 Report to the NHL Board of Governors, President Campbell expressed opposition to any attempt to "water down" the reserve clause and urged the Governors to use the League's position to maintain the provision. [P–59 at pp. 7–8.]

83. Clause 17 of the Standard Player's Contract, Amended Form, June, 1970—the contract used for the 1971–72 season, made no reference to any method for resolving disputes as to salary except by mutual agreement between the parties. [Exhibit D–1, Campbell Affidavit, Exhibit D–4, Cl. 17.]

84. On August 20, 1971, pursuant to a directive of the NHL Owner-Player Council, R. Alan Eagleson and Clarence Campbell initially entered into an arbitration agreement for the resolution of salary disputes for the 1971–72 season naming Edward J. Houston as Arbitrator. [Exhibit D–1, Campbell Affidavit at ¶ 9.]

85. The August 20, 1971 arbitration agreement reflected a change in the means or the manner in which salary was to be determined, and it is clear that the parties did not intend the entire standard player's contract to expire at the conclusion of 1972 because there was no agreement as to arbitration in the contract. [Based on Findings 79–81, 83, 84, 89.]

86. On March 29, 1972, an agreement was reached between the NHL Players' Association and the NHL that salary disputes would be submitted to a neutral arbitrator pursuant to an arbitration agreement signed by R. Alan Eagleson on behalf of the NHLPA and Clarence Campbell on behalf of the NHL. This agreement by its terms expires at the end of three years. [Exhibits P–52 and D–1, Campbell Affidavit at ¶ 10, Exhibit C.] The only purpose of the arbitration agreement was to provide a means for resolving salary disputes for the option years of the Standard Player's Contract. [Exhibit D–1, Campbell Affidavit at ¶ 10.]

87. This arbitration agreement was neither intended nor understood by the parties to it to alter in any way the perpetual nature of the reserve clause. Mr. Eagleson's testimony referred to above before the Senate Commerce Committee and the testimony of Messrs. Mulcahy and Wirtz in their depositions, all were given from three to six months after the March 29, 1972 arbitration agreement was executed. As found above, the testimony of both the owners and the players indicates that, notwithstanding any time limitation in the arbitration agreement, the reserve clause of the Standard Players' Contract continues to be understood as a perpetual option on the players' services without limitation. [Based in part on Findings 79, 80, 81.]

88. Section 2.2 of the By-Laws of the NHL provides in pertinent part:

"The provisions [of the Standard Player's Contract] shall not be changed or derogated from except as may be authorized by resolution of the Governors."

There is no evidence of record to indicate that the arbitration agreement dated March 29, 1972, and alleged to be part of the Standard Player's Contract, has ever been approved by the Board of Governors. [Exhibit P–4, § 2.2.]

89. The record does not indicate that any players who have signed with WHA teams signed an amended March 1972 Standard Player's Contract. Therefore, the court finds that none of the Standard Player's Contracts here in dispute —those between NHL teams and players who have signed with WHA teams for the 1972–73 season—contain a reference to the Arbitration Agreement of March 29, 1972 between NHL member clubs and professional players [Exhibit D–1, Campbell Affidavit, Exhibit C.]

## PARAGRAPH 17 OF THE NHL'S STANDING PLAYER'S CONTRACT AND COLLECTIVE BARGAINING

90. Since 1967, the NHL has recognized the NHL Players' Association as the representative of all the NHL players for purposes of collective bargaining with the players' employers, the various clubs that comprise the NHL, who in turn bargain jointly with the Association. [Exhibit D–1 (Campbell), ¶ 6, and attached Exhibit A, p. 3; Exhibit D–2 (Swados), ¶ 9, p. 23, ¶ 10.] During the 1971–72 NHL playing season, every NHL player was a dues-paying member of the Players' Association. This latter accomplishment was undoubtedly facilitated by a "check-off" arrangement adopted in 1969 by the Players' Association. [Exhibit D–1 (Campbell), ¶¶ 7, 15, attached Exhibit A, p. 4 and attached Exhibit F (Eagleson), pp. 480–81; Exhibit D–2 (Swados), ¶ 10, p. 25.]

91. Bargaining between the NHL Players' Association (NHLPA) and the NHL clubs is carried on principally through the medium of an Owner-Player Council, which meets regularly. Ex. D–

1 (Campbell), ¶¶ 5–10, 15, and attached ex. A, ex. F (Eagleson), p. 481; Ex. D–128 (Mulcahy), p. 26; Ex. D–129 (Wirtz), p. 65. The Owner-Player Council has incorporated into a cumulative book of "Minutes and Agreements" those agreements reached by the Council that were in effect as of January 1, 1972. Ex. D–1 (Campbell), ¶ 6, and attached ex. A.

92. During 1969, 1971 and 1972, the NHL clubs and the NHLPA entered into agreements relating to the arbitration of salary disputes under paragraph 17. The 1971 agreement is the "Agreement Establishing the 'Terms of Reference for the Arbitration of Salary Differences between NHL Member Clubs and Professional Players for the Season 1971–72'" agreed to by the NHL clubs and the NHLPA on June 10, 1971, and signed by the executive director of the Players' Association and the president of the NHL on August 20, 1971, and the 1972 agreement is the "Agreement Establishing the 'Terms of Reference for the Arbitration of Salary Differences between NHL Member Clubs and Professional Players for the Seasons 1972–73, 1973–74 and 1974–75,'" similarly agreed to and signed on March 29, 1972 (hereafter sometimes referred to as the "1971 Arbitration Agreement" and the "1972 Arbitration Agreement" respectively). Ex. D–1 (Campbell) ¶¶ 9–10, and attached exs. B, C. The NHL clubs and the NHLPA have acknowledged that these agreements constitute, during their operative periods, part of the overall set of agreements existing between and binding upon them. [Ex. D–1 (Campbell), ¶¶ 9–10; Ex. D–1 (Campbell), ¶ 6, and attached ex. A, p. 7; Ex. D–1 (Campbell), ¶ 15, and attached ex. F (Eagleson), pp. 485–86; Ex. D–2 (Swados), ¶ 10, p. 26, item 8.]

93. Paragraph 17 of the NHL Standard Player's Contract directly involves terms and conditions of employment and is one of the subjects about which the clubs and the Players' Association have discussed since 1967. [Findings of Fact 94–103].

94. As early as June 1969 the Players' Association and the NHL clubs agreed, following negotiations between them, that disputes over what salary should be paid to a player under paragraph 17 should be determined by binding, third-party arbitration. The agreement reached by the NHL clubs and the NHLPA at that time provided that each party to such a dispute was to select one arbitrator, with the two arbitrators thus chosen deciding the salary question jointly, and that in the event that these two arbitrators were unable to reach a decision, they were to select a third arbitrator who would then decide the issue. Ex. D–1 (Campbell) ¶ 8; Ex. D–2 (Swados), ¶ 10, app. A. Previously, disputes regarding salary under paragraph 17 had been determined by the president of the NHL, as reflected in the version of the Standard Player's Contract then in effect. [Ex. D–1 (Campbell), ¶¶ 8, 12, and attached Exhibit D–3, ¶ 17].

95. This system of arbitration continued in operation for the next two years. At the time of the NHL Board of Governors' meeting of June 8–9, 1971, however, the Owner-Player Council considered the question further and agreed on June 10 of that year to institute a new system on a trial basis for a period of one year. Under that system, salary arbitration decisions under paragraph 17 were to be made by a single independent arbitrator to be chosen jointly by the president of the NHL and the executive director of the Players' Association; and Edward J. Houston, Q. C., was in fact chosen by them to serve as arbitrator. [Ex. D–1 (Campbell, ¶¶ 6, 9, ex. A, p. 7, ex. B; Ex. D–121 (Campbell), pp. 154–55; Ex. P–39, item 18, p. 4.]

96. Further negotiations between the Players' Association and the NHL clubs resulted, on March 29, 1972, in an agreement between those parties extending the 1971 Arbitration Agreement, with certain modifications, for another three years. Under this 1972 Arbitration Agreement, Mr. Houston remains as arbitrator for the next three playing sea-

sons, and a procedure is set out for selecting a successor in case of his inability to so act during the specified three-year period. Ex. D–1 (Campbell), ¶ 10, and attached ex. C; Ex. D–2 (Swados), ¶ 10, item 8; Ex. D–129 (Wirtz), pp. 67–68; Ex. P–39, item 21, p. 5. The NHL Board of Governors, having failed to ratify the 1972 Arbitration Agreement, could assert that the 1972 Arbitration Agreement is not enforceable.

97. The NHLPA and the NHL acknowledge that the Arbitration Agreement, like all Owner-Player agreements, automatically modifies and supersedes any conflicting provisions in *subsequently signed* NHL player contracts and automatically becomes a part of such contracts. Ex. D–1 (Campbell), ¶¶ 10, 15, and attached ex. F (Eagleson), p. 481; Ex. D–127 (Eagleson), pp. 547–8; Ex. D–122 (Cooke), pp. 53–54, 56; Ex. D–123 (Snider), Vol. 2, pp. 78–79, 82; Ex. D–125 (Mulcahy), Vol. 4, pp. 33–35; (for a discussion of the effect on contracts then in existence, see pages 505–10, *infra*). The form of the NHL Standard Player's Contract promulgated by the League in June 1972 incorporates this agreement by explicit reference in paragraph 17. [Ex. D–1 (Campbell), ¶ 11; Ex. P–1, ¶ 17.]

98. In the summer of 1969, the NHL Board of Governors approved the use of binding third-party arbitration to settle salary disputes under paragraph 17 (Ex. D–1 (Campbell), ¶ 6, and attached ex. A, pp. 7–8; Ex. D–2 (Swados), ¶ 10, and attached app. A, p. 1; Ex. P–39, item 6, p. 2); and the 1971 and 1972 Arbitration Agreements state they are based on authorization by both the Players' Association and the NHL. [Ex. D–1 (Campbell) ¶ 9, and attached ex. B, p. 4; Ex. D–1 (Campbell), ¶ 10, and attached ex. C, p. 4; Ex. D–121 (Campbell), pp. 153–55.] At the October 25–27, 1971 semi-annual meeting of the Board of Governors, the Board unanimously approved and ratified a change in the NHL Standard Player's Contract to incorporate the provision for binding arbitration of salary disputes under para-

graph 17 already agreed upon through collective bargaining. [Ex. P–39, item 19, p. 5.]

99. Assuming that the 1972 Arbitration Agreement will be ratified by the Board of Governors, the legal status of the contractual obligations of the players upon the expiration of the 1972 Arbitration Agreement at the end of the 1974–75 playing season is unclear. This legal issue is further clouded because, as was done in 1971 and 1972, the Players' Association and the NHL can agree to extend the arbitration arrangements previously entered into. Some NHL officials assert that upon the expiration of the 1972 Arbitration Agreement at the end of the 1974–75 playing season there will exist no provision in the NHL Standard Player's Contract for the determination of salary under paragraph 17. Therefore, they contend there would at that point be no binding contractual obligation upon any player, under paragraph 17, to sign a new contract for the 1975–76 playing season. This conclusion, while a conclusion of law (Ex. D–128 (Mulcahy), pp. 32–33), is expressed in the deposition testimony of Mr. Jack Kent Cooke, president of the NHL California Sports, Incorporated, taken on September 14, 1972, and Mr. Edward Snider, chairman of the Board of the NHL Philadelphia Hockey Club, Inc., taken on September 25, 1972. As the testimony appearing below indicates, Cooke recognized the possibility of an extension of the Arbitration Agreement and qualified his answer to allow for that contingency. [Ex. D–1 (Campbell), ¶ 15; Ex. D–122 (Cooke), pp. 58, 69; Ex. D–123 (Snider), Vol. 2, pp. 78–79].

100. On September 14, 1972, Mr. Jack Kent Cooke, President of the NHL California Sports, Incorporated, and a member of the Board of Governors of the NHL, was asked in a deposition by Mr. Stabile, WHA counsel, whether, assuming that a player contract was entered into for an express term of one year, it would "be the position of California Sports that in those circumstances the term of the Standard Play-

er's Contract is three years" by virtue of the operation of the 1972 Arbitration Agreement. His answer was that "[i]t would, at this moment, *subject to an extension of the current arbitration agreement and collective bargaining agreement.*" Ex. D–122, p. 58 (emphasis added).

101. Similarly, Mr. Edward Snider, Chairman of the Board of the NHL Philadelphia Hockey Club, Inc., testified in his deposition on September 25, 1972, that "[t]he agreement we have with the Players Association include[s] many, many things of which an arbitration agreement is one and the arbitration agreement is for three years which is an amendment to or whatever you might call it to the player's contract that in essence in my view gives [us] the rights to our players for three years." [Ex. D–123, pp. 78–79.]

102. Mr. Alan Eagleson, executive director of the Players' Association, testified before the Senate Commerce Committee in June 1972 that "[e]very contract is signed for three years. It is for three years." [Ex. D–1 (Campbell), ¶ 15, and attached ex. F, p. 488.] His testimony, however, provides no substantiation as to whether all of the players' contracts are of three years' duration or that they all cover the time span of the March 29, 1972 Arbitration Agreement. In fact, some players have had contracts of less than three years. [Ex. P–77, ¶ 6.]

103. The negotiations with respect to *arbitration* outlined above have been bona fide, good-faith collective bargaining negotiations relating to genuine issues of employer-employee relations, and the currently existing 1972 Arbitration Agreement is a product of such negotiations. This finding does *not* mean that there has been bona fide, good-faith collective bargaining with respect to the "reserve" clause. [Findings 90–102, *supra.*]

104. In addition to the above negotiations with respect to salary arbitration under paragraph 17, "discussions" between the parties relating to that paragraph have taken place on several occasions. [Ex. D–59, item 1; Ex. D–60; Ex. D–61; Ex. D–62; Ex. D–63; Ex. D–128 (Mulcahy), pp. 26–29; Ex. D–129 (Wirtz), pp. 50, 65–68.]

105. Other than the self-serving statement of certain NHL representatives that the reserve clause has been maintained in its traditional form as a trade-off for certain benefits to the players, the record is devoid of any evidence implying much less demonstrating that the reserve clause has been retained as the result of serious, good-faith collective bargaining.

106. Although the issue of the reserve clause has been discussed often, neither party has ever modified its position. The owners have been insistent on the continuation of the reserve clause basically in its present form, and the players have, since the formation of the Players' Council, been consistently against this type of reserve clause. As an example, on May 26, 1969, Mr. Alan Eagleson, Executive Director of the NHLPA, made as his first request that "the standard NHL contract be amended so that a player has the right to play out his option in a manner similar to that which exists in professional football in Canada and in the U.S.A." [Exhibit D–59].

At a later joint press conference on June 11, 1969, Mr. Alan Eagleson, executive director of the Players' Association, and Mr. Charles Mulcahy, negotiator for the NHL clubs in the Owner-Player Council, stated specifically that the "matter of the reserve clause was discussed" in the Council and that the parties "will continue to discuss" the issue. [Ex. D–2 (Swados), ¶ 10, and attached app. A, p. 1.]

It should be noted that while apparently the "reserve" clause was discussed, there was never any modification of the provision. In 1969, the Players' Association signed an agreement, independent of the discussions concerning the "reserve" clause, which granted the

players improvements in the pension fund system.

The minutes of the Player-Owner Council show that "a committee composed of Messrs. Berenson, Ullman, Eagleson, Putnam, Wirtz, and Mulcahy has been formed to make a joint review of this matter [the reserve clause] upon the express understanding that the formation of said Committee does not necessarily imply that either the Owners or the Players will change their position in this regard. The first of these meetings was held on August 20th, [1969]." Despite continuing discussions from that date to the present, the reserve clause has not been modified. [Ex. D–62].

107. Additional discussions regarding paragraph 17 have taken place at various times and are continuing with no change of position by either party, as indicated by a press release issued jointly on August 30, 1972, by Mr. Eagleson and Mr. Clarence Campbell, president of the NHL. That press release states with respect to an August, 1972 meeting of the Owner-Player Council (Ex. D–125 (Mulcahy), vol. 3, p. 37), that "[s]ection 17 of the NHL contract was discussed again. Meetings took place on the reserve clause in early 1972 and this matter was raised again." [Ex. D–2 (Swados, ¶ 10, and ex. A, p. 3].

108. I find that the testimony of both R. Alan Eagleson and Charles W. Mulcahy, Jr., NHL owner representative to the Owner-Player Council, are credible and that they establish that the reserve clause has never been the subject of bona fide, good-faith collective bargaining. [Findings 109–110, *infra.*]

109. On June 22, 1972, Mr. Eagleson wrote to Mr. Mulcahy and made the following observations:

"Although I distinguish between hockey and baseball in that the latter enjoys antitrust exemption, I noted with interest one of the comments of a dissenting judge. *He suggested that the reserve clause should be the subject of collective bargaining.*

*As you know, we have skirted this issue for some time now.* Would you agree that this matter should be a topic for discussion at our next Player-Owner Council Meeting?" [Exhibit P–55 (emphasis added).]

110. Mr. Mulcahy in his deposition taken on October 2, 1972, when asked to describe the nature of the discussions in the Player-Owner Council concerning the reserve clause responded as follows:

"The proposals were made, I believe, by both sides, sir.

Let me put it then this way: I don't know that they were actually proposals. Proposals is the wrong word. There were—There was an examination by both sides of various avenues that could—that were possibilities of solving it. No one said, 'This is our proposal, if you would accept this, we would do this.' *They never got to that stage.*

It was an examination of what other sports had done, whether they would be applicable, could be used by hockey, and also some that have never been used by other sports, I believe." (emphasis added) [Exhibit P–31, Mulcahy dep. at p. 30].

111. The Court, therefore, finds that the reserve clause, as it now exists, has been discussed; the owners have never been willing to modify it except as to the arbitration of salary. There is no indication that for any of the benefits offered the players that the owners would have been willing to modify the reserve clause in lieu of the other benefits given. Thus in that context there does not appear to have been any "collective bargaining" on the reserve clause except as to arbitration of salary. Further, the arbitration of salary did not in any respect modify the perpetual nature of the reserve clause.

112. Paragraph 13(c) of the 1970 version of the Standard Player's Contract was eliminated from the Standard Contract as a result of collective bargaining. [Ex. D–2 (Swados), ¶ 10,

items 7, 13.] Inasmuch as persons knowledgeable with respect to NHL affairs could not recall an instance in which paragraph 13(c) had been invoked (Ex. P–51, p. 1), and, indeed, since the provision would not have permitted decisions to "cut" a player to be made arbitrarily, the impetus for this change came solely from certain of the NHL clubs, along with the subsequent support of the Players' Association. [Ex. D–1 (Campbell), ¶ 15, ex. F. (Eagleson), pp. 481–84, especially p. 484)]. Complete deletion of paragraph 13(c) with respect to the contracts of all clubs was not possible until the issue was negotiated and agreed upon by the Owner-Player Council. [Ex. D–137 (Swados), pp. 8–9] This change had the effect of removing the only exception to the club's honoring its obligation under paragraph 17 to tender to the player a contract for the year following the original period covered by the prior contract. [Ex. D–1 (Campbell), ¶¶ 13–14; Ex. D–2 (Swados), ¶ 10, app. A, p. 3.]

## THE NECESSITY FOR SOME FORM OF RESERVE CLAUSE

113. Every major professional team sport utilizes some form of "reserve" clause in its standard player's contract. [Exhibit D–1 (Campbell), attached Exhibits E–1 through E–4.] Some of the purported justifications for a "reserve" clause (e. g., the need for competitive balance within the league) apply to all sports. A less anti-competitive "reserve" clause than the present one may be needed in hockey.

114. In order to be successful, a professional hockey league normally must have some of the qualities of parity among its member teams which make other sports successful. That is, the public must believe that there is relative parity among the member teams and that each team has the opportunity of becoming a contender over a reasonable cycle of years and a reasonable chance of beating any other team on any given night. [Exhibit D–134 (Davidson), pp. 17–21; Exhibit D–135 (Murphy), pp.

92–96; Exhibit D–8, p. 23; Exhibit D–1 (Swados), pp. 29, 37; Exhibit P–27 (Campbell, supplemental designation), p. 93; Exhibit D–121 (Campbell), p. 220.]

115. The history of the NHL's Stanley Cup Series, the "World Series" of hockey, indicates that relative parity does not exist within the NHL. In the last twenty years, Montreal has won the Stanley Cup on twelve occasions, Toronto has won four times, Detroit has won three times, and Chicago has won once. [Exhibit D.]

116. The founders of the WHA believe that even if the quality of the hockey played by its member teams is not as high as in the NHL, the WHA will still be successful if it can maintain sufficient parity of quality among its own teams. [Exhibit D–135 (Murphy), pp. 92–93.]

## EXPANSION

117. The NHL was organized in 1917. By 1942, the League consisted of six teams. In 1967, six new teams were added. In 1970, the NHL expanded to fourteen teams. [Exhibit D–2 (Swados), pp. 21–24.]

118. In 1971, the NHL authorized franchises for Nassau County, New York, and Atlanta, Georgia, for additional expansion to 16 clubs for the 1972–73 season. [Exhibit P–58.]

119. Since 1966, the NHL has received in excess of 36 million dollars for the sale of the rights to play major league professional hockey. [Exhibit D–2, Swados Affidavit at 36; Exhibit P–38, Wirtz Deposition at pp. 12–15.]

120. In 1967, the NHL, then a six-team organization, permitted six additional teams to be formed, charging $2,000,000 to each new team for the privilege of joining the league. That $2,000,000 from each new entrant was distributed among the original six teams. [Exhibit P–38, Wirtz Deposition at p. 26; Exhibit D–2, Swados Affidavit at pp. 36–37.]

121. Since 1967, the question of additional expansion has been the subject

of constant discussion in the NHL. [Exhibit D–121 (Campbell), p. 218; Exhibit P–35 (Snider), pp. 34–36; Exhibit D–123 (Snider), pp. 67–68.] At the time of the 1970 expansion, the NHL indicated that additional expansion was anticipated. [Exhibit D–2 (Swados), p. 24; Exhibit P–35 (Snider), pp. 34–36; Exhibit D–123 (Snider), p. 68.]

122. In 1965, Clarence Campbell announced that the intention of the league was that expansion would make the NHL " . . . the *only* major professional hockey league operating from coast-to-coast in the United States or Canada." (Emphasis added.) [Exhibit P–73.]

123. In the course of that expansion 120 players were drafted from the six original clubs which had a reserve list of 37 players and a squad of 20. Clarence Campbell stated that that draft from the original clubs rosters could occur without lessening the level of play in the NHL. [Exhibit D–2, Swados Affidavit, pp. 24, 28; Exhibit P–73.]

124. The NHL has permitted a similar loss of skilled players in the successive expansions, since existing teams can protect only 15 players. [Exhibit P–58, at pp. 9, 12.]

125. In 1970, the NHL admitted two additional teams to its league, Vancouver and Buffalo. Each of those new clubs paid in excess of $8,000,000 for the acquisition of the local American Hockey League and Western Hockey League Clubs, for the acquisition of the territorial rights of the Western and American Hockey Leagues, and for distribution to NHL clubs. [Exhibit D–2, Swados Affidavit, p. 36.]

126. "Similar costs will be incurred by the Atlanta and Long Island Clubs entering the league this year." [Swados Affidavit at pp. 36–37; Exhibit P–38, Wirtz Deposition, pp. 12–15.]

## FINDINGS OF FACT RELATING TO NHL REACTION TO ANNOUNCEMENT OF WHA FORMATION

127. The WHA was formed in 1971. The NHL learned of the organization of the league by at least August 1971, and subsequent to that date the following events outlined in Findings of Fact 128–143, *infra*, occurred: [Defendants' Proposed Pretrial Order, Statement of Fact 22, Exhibit P–9]

128. On August 4, 1971, a special and highly confidential NHL Presidential Study Committee was established to make recommendations with regard to several problems faced by the NHL in the light of the formation of the WHA. The Committee had representatives from six of the member clubs of the NHL. [Exhibit P–9, at pp. 2–3.]

129. The initial meeting of the special NHL Study Committee was held in New York City on September 15, 1971, the agenda calling for the consideration of:

(1) The implication of the proposed formation of the World Hockey Association;

(2) All aspects of future expansion of the NHL; and

(3) *The preservation of the reserve clause in the Standard Player's Contract.* (Emphasis added.) [Plaintiffs' Amended Supplemental Consolidated Proposed Pretrial Order, Plaintiffs' Statement of Fact 27 (admitted in Defendants' Proposed Pretrial Order); Exhibit P–9.]

130. That Study Committee amended Provision 13(c) of the Standard Player's Contract for use by NHL clubs in 1972–73 removing the club's right to unilaterally void the Contract in order to make the Standard Player's Contract more "bilateral." This change was initiated by the owners and not by the Players' Association. [Exhibit P–51.]

131. As a result of a report of the NHL Study Committee, the Board of Governors of the NHL at its October 25–27, 1971, meeting made certain changes in the Standard Player's Contract, including the elimination of Paragraph 13(c) and further called a special meeting of the Board for November 9 to consider expansion. [Exhibit P–39, Minutes of Board of Governors Meeting on October 25–27, 1971, at 5, 6.]

132. At the November 8–9, 1971 special meeting the Board of Governors awarded franchises to the territories of Long Island and Atlanta, each franchise to cost $6,000,000 before territorial indemnification. [Exhibits P–27, Campbell dep., pp. 143–44; P–39, Minutes of Board of Governors Meeting on November 8–9, 1971, at 2; P–10, Campbell Press Release; P–58.]

133. The franchises were awarded to territories before the individual owners were selected. [Exhibit P–27, Campbell dep., p. 136.]

134. Prior to November, 1971, the NHL Board of Governors was aware that the WHA was interested in obtaining a lease for its franchise in the New York metropolitan area in the Nassau Coliseum which was presently under construction in Hempstead, Long Island. [Exhibit P–41.]

135. The Nassau Coliseum together with Madison Square Garden are the only two arenas in such metropolitan area suitable for major league professional hockey. The new WHA franchisee's efforts to obtain a lease on the Nassau Coliseum were rejected by William Shea, "Sports Consultant" of that institution, who is also a member of the Board of Directors of the Los Angeles Kings, a defendant in this action and a member of the NHL. [Plaintiffs' Amended Supplemental Consolidated Proposed Pretrial Order, Plaintiffs' Statement of Fact 32 (admitted in part in Defendants' Proposed Pretrial Order); Exhibits P–40, P–41.]

136. In January, 1972, a committee of the Board of Governors of the NHL recommended the award of the Long Island franchise to a group headed by Roy Boe who was also the owner of the New York franchise in the American Basketball Association. By December 28, 1971, Mr. Boe who had agreed upon an indemnification fee of $4,000,000 to the New York Rangers and had acquired a satisfactory lease for the Nassau Coliseum, therefore, was awarded the franchise. [Exhibit P–39, Minutes of NHL Board of Governors Meeting for January 24, 25, 1972 at 2; Exhibit P–38, Wirtz Dep., p. 26.]

137. In late May, 1972, the NHL Board of Governors established a Legal Committee whose duties, *inter alia,* were to develop and implement a policy with regard to players who had signed contracts with the WHA. The Legal Committee promptly employed the law firm of Covington & Burling in Washington, D. C., to aid in this task. [Exhibit P–39, Minutes of NHL Board of Governors Meeting for June 6, 1972, at 23; Exhibit P–37, Swados Dep., pp. 27, 29–30.]

138. During the summer President Campbell suggested to all member teams that they send a form letter to all players, particularly those who had signed with the WHA reminding them of the club's contract rights and, at the club's option, raising the question of litigation to enforce the reserve clause. [Exhibits P–13(a), P–14; P–27, Campbell Dep., p. 200.]

139. At a later date a further letter was circulated by member teams and used by many of those teams to demand a return of players who had signed with the WHA. [Exhibit P–37, Swados Dep., pp. 33–35; Exhibit P–16.]

140. Member clubs of the NHL have circulated to particular players letters substantially similar in form and substance, wherein such player is threatened with legal action if he does not return to the NHL. [Exhibit P–16; Findings 190–197, *infra.*]

141. Since the advent of the World Hockey Association, salaries have increased even for those players who have remained with the National Hockey League. [Exhibits P–24; P–69, Allen Dep., pp. 222, 256.]

142. As of the present date NHL member clubs have instituted at least 11 legal actions against NHL players who have signed contracts with WHA teams. The targets of the suits have included several well-known players, such as Bobby Hull, Derek Sanderson, and Gerry Cheevers. [Plaintiffs' Amended Supple-

mental Consolidated Proposed Pretrial Order; Statement of Fact 46 (second sentence admitted in Defendants' Proposed Pretrial Order); Exhibit P–27, Campbell dep., pp. 243–45; Exhibit P–49.]

143. In these legal actions the NHL teams have sought judicial enforcement of paragraph 17 of the Standard Player's Contract, requesting, *inter alia*, injunctions against the particular player from playing for other than the NHL team owning his contract. [Plaintiffs' Amended Supplemental Consolidated Proposed Pretrial Order; Statement of Fact 47 (admitted in Defendants' Proposed Pretrial Order.]

## FINDING OF FACT RELATED TO PLAINTIFF-COUNTERCLAIM-ANT MC KENZIE

144. Plaintiff-counterclaimant McKenzie is 34 years old and has been a major league professional hockey player for 14 years, playing at the position of right wing. [Exhibit P–77, ¶ 2].

145. Major league professional hockey is the only trade or endeavor in which McKenzie can utilize his talents and skills to maximize his vocational satisfactions and income. [Exhibit P–77, ¶ 3].

146. Because of the tremendous requirements of skill, speed and stamina plus the ability to take tremendous physical punishment, professional major league hockey players have a limited number of potential high-earning years during their career. [Exhibit P–77, ¶ 4].

147. Until the recent birth of the WHA, the National Hockey League has been the only major professional hockey league; and major league professional hockey caliber players like McKenzie, in order to play major league professional hockey at all, have been required to play for and negotiate compensation only with the NHL team holding an NHL Standard Player's Contract, which has uniformly retained the so-called "right to renew" clause in paragraph 17. [Exhibit P–77, ¶ 5].

148. The last contract which McKenzie signed with an NHL team is the Standard Player's Contract, dated September 1, 1971, entered into between McKenzie and the Boston Bruins, which contract by its terms expired on September 30, 1972. [Exhibits P–75; P–77, ¶ 6].

149. Paragraph 20 of the Standard Player's Contract signed by McKenzie [Exhibit P–75] provides as follows:

"It is severally and mutually agreed that the only contracts recognized by the president of the league are the standard player's contracts which have been duly executed and filed in the league's office and approved by him."

150. There is no evidence that between September 1, 1971 and September 30, 1972, the stated term of McKenzie's NHL Standard Player's Contract, McKenzie agreed to amend, modify or in any way alter the terms of the aforesaid contract.

151. McKenzie played hockey for the Boston Bruins in the National Hockey League during the 1971–72 playing season. Every player during that season was a member of the NHL Players' Association, which negotiated the Arbitration Agreement of March 29, 1972. *Verified Complaint in No. 72–1807, ¶ 10.*

152. The NHL Standard Player's Contract, subject only to § 2.2(a) of the NHL By-Laws, is inviolate and cannot be modified even by the President of the league. [Exhibit P–25, at 568].

153. The NHL By-Laws in § 2 specifically refers to, incorporates, adopts and requires the Standard Player's Contract. Section 2.2 of the By-Laws provides as follows:

"2.2 The following standard forms are authorized:

*Standard Player's Contract.* A contract to play hockey for a Member Club shall be made on a standard player's *contract as adopted by the Governors,* which form is contained in

Appendix I to these By-Laws. *The provisions thereof shall not be changed or derogated from except as may be authorized by resolution of the Governors . . . "* (emphasis added).

154. There is no evidence that the so-called arbitration agreement of March 29, 1972, relied on by ·defendants has ever been formally approved or adopted by the Board of Governors of the National Hockey League, as required by NHL By-Laws 2.2(a).

155. Prior to being assigned to the Philadelphia Flyers, as part of the 1972 "Expansion II" intra-league draft, McKenzie was left "unprotected" by the Boston Bruins and therefore exposed to possible draft by either the New York Islanders or Atlanta Flames, the new expansion teams. [Exhibit P–70 at 29, 45; Exhibit P–69 at 264].

156. McKenzie was left "unprotected" by the Boston Bruins organization, because it felt that it had excellent young players whom it could not afford to lose. [P–69 at 265].

157. Neither the Islanders nor the Flames, the 1972 expansion teams, picked up McKenzie as part of the intra-league draft. [Exhibits P–70 at 29, 42; P–77, ¶ 7, P–69 at 266].

158. Although McKenzie was not on the "protected list" of the Boston Bruins at the commencement of the expansion draft proceedings in 1972, he was placed on the list immediately after the first Boston Bruins player was drafted. Since McKenzie was then a "protected player" he could not thereafter be drafted by either of the NHL expansion clubs. [Ex. P–68 (Allen), p. 266.]

159. In June 1972, McKenzie signed a three year contract with the Philadelphia Blazers of the WHA, as player and head coach, at an annual salary of $100,000. [Exhibit "B" to Complaint in C.A. No. 72–1902; Exhibit P–77, ¶ 8].

160. Players are almost never consulted prior to a player contract assignment by the NHL clubs holding their contracts whether and where the player should be assigned. [Exhibits P–69, at 258–59 and P–34 at 55].

161. On July 27, 1972, the Bruins assigned McKenzie's contract to the Flyers. [Exhibit P–70 at 32, 45].

162. The consideration ·for the assignment of McKenzie's contract was $30,000 cash [Exhibit P–70 at 32, 34, 37, 45, 47, 50], less than the "waiver" or minimum price permitted for an intraleague assignment by the NHL By-Laws. [Exhibit P–4, § 16A.3].

163. Boston never informed McKenzie of its assignment of McKenzie's contract to the Flyers. [Exhibit P–70 at 42, 44, 55, 57].

164. At the end of July, McKenzie received a telephone call from Don Earle, former broadcaster of Boston Bruins games who invited McKenzie to meet with his "bosses" at Joe's Aquarium restaurant in Boston on the evening of August 2, 1972; McKenzie was led to believe that Earle's "bosses" were in the communications or advertising fields and wished to speak with McKenzie regarding opportunities for him in these areas. [Exhibit P–77, ¶ 10; P–70 at 45, 58].

165. Earle's telephone call to McKenzie to arrange the meeting was ordered by Edward Snider, Chairman of the Board and owner of the Philadelphia Flyers. [Exhibit P–70 at 40–42, 53–55].

166. On August 2, 1972, after attending a meeting with Snider and Gilbert Stein, Esq., General Counsel of the Flyers, McKenzie for the first time was informed of the assignment of his contract by the Bruins to the Flyers. [Exhibits P–70 at 42–43, 55–56; P–77, ¶ 11].

167. At the August 2, 1972 meeting, McKenzie was offered by the Flyers a five-year playing contract at $100,000 per year, plus an additional five-year contract at an undetermined salary in an undisclosed capacity in the Flyers' management. [Exhibits P–36 at 123, 124; P–77, ¶ 12].

168. Subsequent to August 2, the Flyers' offer to McKenzie, referred to

above, was repeated but also was coupled with the threat that should a court of law enjoin McKenzie from playing for any other team than the Flyers, the offer would be withdrawn and any contract would only be for one year at $100,000 per year. [Exhibit P–77, ¶ 12; P–36 at 121, 123, 124].

169. On August 10, 1972, counsel for McKenzie informed Stein that McKenzie would keep his contract with the Blazers and his word to the hockey fans of Philadelphia by playing for the Blazers, and that he would not under any circumstances negotiate with or play for the Flyers. [Exhibits P–36 at 112–114; P–77, ¶ 13].

170. On September 6, 1972, the Flyers filed a Complaint in Equity in Philadelphia Common Pleas Court (September Term, 1972, No. 378), which was removed to this Court on September 13, 1972 (C.A. No. 72–1807), seeking an injunction not only to prevent McKenzie from playing on the Blazers hockey team, but also to prevent him from acting as their head coach, and to prevent him from being paid by the Philadelphia Blazers. [Complaint-Equity, C.A. No. 72–1807, p. 8; Exhibit P–77, ¶ 14].

171. Prior to October 1, 1972, when all parties agree McKenzie was contractually bound under his contract with Boston, and after the assignment of that contract to the Philadelphia Flyers (which assignment also took place prior to October 1, 1972), McKenzie in violation of his contract engaged in extensive promotional and advertising activities on behalf of the Philadelphia Blazers. Exhibit D to Verified Complaint in C.A. 72–1807; Ex. P–75, ¶ 8.

172. If McKenzie is not permitted to play or to coach the Blazers this year—the opening and therefore financially crucial season for the Blazers—on account of enforcement of the reserve clause, he and hockey players and coaches like himself will not have the opportunity to negotiate the competitive salaries occasioned by the birth of the WHA, or even in some cases to play major league professional hockey at all. [Exhibits P–77, ¶ 15; P–24 at 222; P–69 at 256–257].

173. McKenzie asserts that he will not play for the Flyers during the 1972–73 season or any other season. [Exhibits P–77, ¶ 13; P–36 at 112–114].

174. If McKenzie is not allowed to play as a member of the Blazers team during the upcoming year, as a result of enforcement of the reserve clause, at the present stage of his career, McKenzie may never be able to play major league professional hockey again due to the rigorous requirements of continuing exercise, coordination and competitive team play. [Exhibit P–77, ¶ 16].

175. The loss of McKenzie's services to the Blazers would be severe and irreparable; McKenzie is not only a player, but head coach of the Blazers, whose team has to date played thirteen league games, losing eleven. The competitive accomplishments and financial success of the Blazers would be adversely affected if McKenzie is precluded from coaching and playing with the Blazers.

176. McKenzie recently broke his right arm and was then advised by his physician that he would be unable to play for approximately four to six weeks. The Blazers opened their season on October 12, 1972. Although McKenzie shall not be able to play until his arm heals, the Blazers require his services as their head coach. [Exhibit P–77, ¶ 14].

177. The Flyers will suffer no substantial prejudice if they play without McKenzie or if McKenzie plays and coaches for the Blazers.

Even if the Flyers sustain some injury, such harm would be insubstantial and the balance of hardship clearly would favor McKenzie. The Flyers presently have under contract four right wings of major league professional hockey caliber, exclusive of consideration of McKenzie (the validity of whose contract is challenged herein), plus other players of similar caliber who also can

play right wing. [Exhibit P–69 at 266–267].

178. If McKenzie is not permitted to play for or coach the Philadelphia Blazers, the Blazers have agreed to pay McKenzie in the event he is enjoined and have agreed to indemnify McKenzie for legal expenses or any money judgment against him resulting from the execution of the contract with the Blazers. [Ex. P–76, addendum ¶ 4.] Even if McKenzie is indemnified by the Blazers, the Blazers will suffer the dual and substantial hardships of paying McKenzie large sums of money and operating without his services as a player and coach.

### Irreparable Injury and Right to Equitable Relief

179. The NHL was organized in 1917 and consisted of only six teams during the entire 25-year period preceding its expansion to twelve teams in 1967. The WHA, on the other hand, held the first meeting of its incorporators on July 1, 1971, and seeks to create a viable major professional hockey league of twelve teams in little more than one year. [Ex. D–2 (Swados), pp. 21–22; Ex. D–8, p. 1.]

180. The founders of the WHA started on the premise that they probably would not be able to get many players from the NHL to play for the new league, and for budgetary reasons would not want too many NHL players, and that they therefore should draw players from all the minor leagues, including the International and Eastern leagues, from the amateur leagues, and from the European leagues. They believed that these leagues offered a great reservoir of players from which the WHA could procure a number of talented hockey players. [Ex. D–115; Ex. D–135 (Murphy), pp. 69–71; Ex. D–8, pp. 152–153.]

181. Since the formation of the WHA in 1971, it and its member teams have nevertheless planned to induce many players under contract to NHL teams to disregard the "reserve" clause in their 1971–72 contracts and to sign a contract to play for a WHA team in the 1972–73 hockey season. [Ex. D–8, pp. 22, 26; Ex. D–9, pp. 6, 9; Ex. D–10; Ex. D–22; Ex. D–23.]

182. The WHA entered into an employment agreement with one Steven Arnold, an agent for various professional athletes (including hockey players), pursuant to which Arnold agreed to assist the WHA and its clubs to sign to WHA contracts players whom the WHA teams had "drafted" from the NHL and other leagues. Arnold was given the exclusive right to negotiate with certain such players on behalf of the WHA teams which had "drafted" them. The WHA agreed to pay Arnold a fixed salary plus a bonus of $1,500 for each minor league player, $2,500 for each NHL player, and $5,000 for each NHL "star" he signed to a WHA contract. Arnold has been successful in persuading numerous players under contract to NHL teams to disregard the "reserve" clause in their 1971–72 contracts and to sign contracts to play for WHA teams in 1972–73. [Ex. D–10; Ex. D–23; Ex. D–22; Exs. D–12 through D–20.]

183. In order to induce Bobby Hull, an NHL "superstar" to disregard the "reserve" clause in his contract with the Chicago Blackhawks covering the 1971–72 season, each member club of the WHA agreed to pay its pro rata share of a million-dollar bonus offered Bobby Hull to sign a contract with the WHA club which "drafted" him (the Winnipeg Jets). Bobby Hull accepted the offer, signed a contract with the Winnipeg Jets, and has been paid the million-dollar bonus. [Ex. D–9, p. 30; Ex. D–8, pp. 88–89, 118–119, 142; Ex. D–73; Ex. D–134 (Davidson), pp. 81–86; Ex. D–135 (Murphy), pp. 154–159.] The record is devoid of any evidence that any two NHL clubs have agreed to share collectively the cost of retaining any NHL star in the NHL.

184. During the entire period of time that the WHA and its member clubs have planned to induce and have induced players under contract to NHL

teams to disregard the "reserve" clause in their NHL contracts, the WHA and its member teams have been well aware that no court has ever held the NHL "reserve" clause to be invalid or unenforceable and that, if tested, the NHL "reserve" clause might be upheld by the courts. [Ex. D–112; Ex. D–66; Ex. D–100, p. 3, ¶ 4; Ex. D–101, p. 5, ¶ 4; Ex. D–102, p. 3, ¶ 6; Ex. D–105, p. 5; Ex. D–106, p. 4.]

185. Since its formation in the summer of 1971, the WHA and its member teams have planned to engage in antitrust litigation against the NHL and its member teams challenging the validity of the NHL "reserve" clause. [Ex. D–8, pp. 17, 27, 59; Ex. D–9, pp. 20, 21(B); Ex. D–134 (Davidson), pp. 41–42.]

186. Shortly after its formation, the WHA and its member teams established a legal committee and retained special outside counsel in order to prepare for the contemplated antitrust litigation and to draft a complaint against the NHL and its member teams which would challenge, *inter alia*, the validity of the NHL "reserve" clause under the antitrust laws. As early as September 24, 1971, special outside counsel gave a report to the WHA board regarding "the legal problems which the league would be faced with in conjunction with the NHL."

187. By February 11, 1972, a draft of a complaint against the NHL and its member teams had been completed, the WHA and its member teams had approved its filing, and the legal committee and outside counsel of the WHA were instructed by the WHA Executive Committee to put the complaint into final form as quickly as possible. [Ex. D–9, p. 20; Ex. D–8, p. 59.]

188. Despite these preparations, neither the WHA nor any of its member teams chose to seek a declaratory judgment as to the validity of the NHL "reserve" clause before inducing NHL players to jump to the WHA and before making the financial investments necessary to establish a new league. Instead they chose to wait until August 18, 1972, to file the first of several complaints against the NHL and its members and even then did not seek preliminary relief from enforcement of the "reserve" clause until September 18, less than a month before the opening of the WHA season. [Complaint and Motion for Temporary Restraining Order and Preliminary Injunction in C.A. 72–1661.]

189. 111 of the 158 players signed as of July 21, 1972 by the 12 teams of the WHA for the 1972–73 playing season were subject to reserve clauses in their 1971–72 contracts with the NHL, AHL, CHL and WHL [Exhibit D–116]. Presently, more than 200 of the 345 of the players signed to WHA teams were subject to reserve clauses in their 1971–72 contracts with the NHL, AHL, CHL and WHL. [Exhibit D–2, Swados Affidavit, § 5 at 8; Exhibit D–131]. Approximately 58 to 60 of these 200-plus players played for an NHL team during the past season. The remainder (more than 140 players) played with a minor league team last year; [Ex. D–2 (Swados), p. 8; Ex. D–134 (Davidson), p. 68; Ex. D–131.]

190. Defendants by letter have threatened many of the players subject to the reserve clause in the 1971–72 contracts who signed or negotiated with WHA teams with the intention to take all steps necessary to enforce the reserve clause. [Exhibit P–16].

191. Letters sent by the New York Rangers, Pittsburgh Penguins, Montreal Canadiens, Minnesota North Stars, California Golden Seals, Boston Bruins, and Buffalo Sabres of the NHL and the Baltimore Clippers of the AHL to players who reportedly had signed with WHA teams contained the following language:

"The purpose of this letter is to:

1. Remind you that you are under a contract which requires you to sign a Standard Player's Contract with the [name of team] for the season 1972– 73, and

2. To notify you that we intend to enforce that contract."

[Exhibit P–16].

192. The Buffalo Sabres, in addition to the letters containing the above language, sent a letter to Steve Cuddie dated July 20, 1972 stating:

"I have been told that you have already made an agreement with the WHA, but I have no way of knowing that is true. I must remind you that it is possible that we may go to the courts in order to protect our interests; and regardless of what other people say, we are talking from great strength."

[Exhibit P–16]

193. The St. Louis Blues sent out letters containing the following language:

"I wish to bring your attention to the fact that you have a contract with Missouri Arena Corporation a/k/a St. Louis Blues to play for it, which they intend to enforce."

[Exhibit P–16]

194. The Philadelphia Flyers sent letters containing the following language:

"I trust that you will see fit to comply with your contract and spare all of us any unnecessary litigation."

[Exhibit P–16]

195. The Chicago Blackhawks sent a letter to Andre Lacroix dated August 1, 1972 containing the following language:

"Wherever required, the Black Hawks fully intend to take all steps necessary to protect their rights and interests and to enforce the terms of their contracts."

[Exhibit P–16]

196. The Toronto Maple Leafs sent letters containing the following language:

"I know you are aware that under the terms of your Standard Player's Contract, you are committed to play hockey for the Toronto Maple Leafs next season and precluded from playing hockey for any other team. If neces-

sary, we intend to enforce the terms of that contract."

[Exhibit P–16]

197. The Detroit Red Wings sent letters containing the following language:

"We have heard reports that you have either signed or intend to sign a contract with some other hockey club. If these reports are correct, I believe you should immediately consult your attorney so as to be fully apprised of your obligations to the Detroit Hockey Club. As you are aware the Detroit Hockey Club has always fulfilled its obligations to you under its contracts. We, therefore, expect you to fulfill your obligations to it. You should know that we intend to take all necessary legal action to enforce these contracts."

[Exhibit P–16]

198. Of the more than 200 players signed by WHA teams who were subject to a "reserve" clause in their 1971–72 contracts, in the case of the NHL Clubs subject to the jurisdiction of this Court, only seven players have been sued in state or federal court proceedings now pending (Sanderson, Cheevers, Barrie, Johnson, Woytowich, Hull, and McKenzie). These suits have been consolidated for trial and involve only two state court and two federal court proceedings. In each of these cases, so far as the record at this stage of the proceedings shows, the decision to bring suit was not arrived at other than unilaterally by the club involved. [Ex. P–64 (Exhibit B); Ex. D–129 (Wirtz), pp. 61–62; Ex. D–128 (Mulcahy), pp. 24–25; Ex. D–121 (Campbell), pp. 222–224.]

199. Of the seven players presently being sued by the NHL clubs subject to the jurisdiction of this Court, only four (Barrie, Johnson, Woytowich, Hull) have been enjoined (temporarily pending a hearing) from playing with a WHA team. All these injunctions are by state courts. Thus, of the 345 players who have signed WHA contracts, only four

or five are presently enjoined from playing with their WHA teams as a result of the enforcement of the NHL "reserve" clause. (Nassau Sports, Limited (New York Islanders) has a restraining order against Peters, a player claimed by the New York Raiders of the WHA. They have also brought five other player suits, but have no one else under restraint.)

200. This court takes judicial notice of the fact that in the case of Boston Professional Hockey Ass'n v. Sanderson, 348 F.Supp. 261 in the United States District Court for the District of Massachusetts, the defendant and the intervenor Philadelphia Blazers of the WHA in the Sixth Defense to their Answers both took the position that:

> "the plaintiff not only delayed unreasonably in bringing this action so that it is not entitled to relief, but also approved defendant Sanderson's actions and abandoned any right to negotiate with defendant Sanderson concerning extension or renewal of its alleged contract, upon which conduct both defendant and the Philadelphia Blazers have relied, so that plaintiff is estopped to seek relief in this action." [15]

In anticipation of the position taken in defense against the complaint in Sanderson, the NHL teams were justified both in tendering (as required by paragraph 17 of the NHL contract) new contracts to their players who had reportedly signed with a WHA team and in putting them on notice of the team's intent to enforce their NHL contracts, in order to avoid any possible claim of estoppel.

201. Bobby Hull is recognized as one of the greatest living hockey players and is widely known throughout Canada and the United States. [Exhibit P–62, Stukus Affidavit, at ¶ 3; Exhibit P–63, Kaiser Affidavit, at p. 2].

202. The presence of Bobby Hull as a player is, in the opinion of the management of the Winnipeg Jets, essential to the financial well-being and continued operation of the Winnipeg Jets. Hull's absence may well jeopardize the continued existence of major league professional hockey in Winnipeg, Canada. [Exhibit P–62, Stukus Affidavit, at ¶¶ 4, 6; Exhibit P–63, Kaiser Affidavit, at p. 203]

203. The new league, composed of fledgling teams will be dependent upon gate receipts, concession receipts and monies received from radio and electronic media. Players such as Hull, with their popularity, will be a major factor in the success of the new league. [Exhibit P–63, Kaiser Affidavit, at p. 2].

204. There are more than 200 additional players besides Hull who played under contracts whose terms have expired for the NHL, CHL, AHL or WHL in 1971–72 and who desire to play and who have contracted to play for WHA teams in 1972–73. [Exhibit D–2, Swados Affidavit, § 5 at p. 8; Exhibit P–64, Cooper Affidavit, at ¶ 19].

Pending and threatened litigation by NHL member teams against players who have signed with WHA teams misleads and confuses these players and may cause them to disregard their contractual commitments to the WHA. [Exhibit P–64, Cooper Affidavit, at ¶ 19].

205. The uncertainty which surrounds the status of Hull and other professional players has caused the WHA to be unable to negotiate favorable media contracts, and has hampered ticket sales. [Exhibit P–64, Cooper Affidavit, at ¶ 18; Exhibit P–63, Kaiser Affidavit, at p. 3].

206. Continued player suits on the basis of the reserve clause will cause the WHA to make substantial expenditures in legal fees. [Exhibit P–64, Cooper Affidavit, at ¶ 12].

---

15. The language quoted is found in the Sixth Defense of the Answer filed by the intervenor Philadelphia Blazers. The Sixth Defense contained in defendant Sanderson's Answer is identical in its terms, with the exception that it does not refer to Sanderson by name.

207. Injunctions against players who have signed with WHA teams prohibiting them from playing for their WHA teams would signal the death of the World Hockey Association. [Exhibit P–78, Cooper Testimony in Sanderson, at p. 50].

208. The total effect of the NHL's conduct will be to destroy the economic viability of the new league and to return to the NHL their monopoly over major league professional hockey. [Exhibit P–64, Cooper Affidavit, at ¶¶ 10, 12, 18, 19, 20, 21; Exhibit P–78, Cooper Testimony in Sanderson, at p. 50; Exhibit P–63, Kaiser Affidavit, at p. 3].

209. If the WHA should be driven out of business, the public and players would lose the benefit of competition which has already raised players' salaries and made hockey available to new audiences. [Exhibit P–26, Campbell Senate, at p. 535; Exhibit P–32, Mulcahy Dep., at p. 2–88].

210. Some of the injury which the WHA will incur in the absence of a preliminary injunction might have been mitigated if the WHA had attempted to establish its new league on a more modest scale, e. g., with six teams, instead of teams in twelve cities in a little more than one year.

211. While the WHA has contracted with players from many sources, the WHA has contracted with former NHL players only when the NHL contracts expired by September 30, 1972. [Transcript, October 9, 1972, pp. 26–27; Finding 89, *supra*].

212. Any conclusion of law which should also be deemed a finding of fact is incorporated herein by reference.

### III.

### THE LABOR EXEMPTIONS OF THE SHERMAN ACT

A preliminary issue is whether the National Hockey League is entitled to invoke the labor exemptions from the Sherman Act authorized by §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17,[16] 29 U.S.C. § 52.[17] For reasons which hereinafter follow, I conclude that the labor exemptions are not applicable and the National Hockey League is subject to the operations of the anti-trust laws.

Initially, the status of the National Hockey League Players' Association (hereinafter referred to as "Players' Association") must be considered to ascertain if it qualifies as a "labor organization" under § 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).[18] The record indicates that on

---

16. Section 6 of the Clayton Act provides:
 "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

17. Section 20 of the Clayton Act states in relevant part:
 "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges

thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney."

18. Section 2(5) of the National Labor Relations Act stipulates:
 "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the pur-

June 7, 1967, a "Recognition Agreement" was executed between the owners of the National Hockey League and the Players' Association, whereby the Association would be regarded as the official representative of the players in their dealings with the member teams of the National Hockey League. The record, however, does not disclose whether the designation of the Players' Association complied with the provisions of § 9 of the National Labor Relations Act, 29 U.S.C. § 159. I cannot definitively conclude that the National Labor Relations Board has actually certified the Players' Association as the approved collective bargaining representative.

But even if the Court assumes, *arguendo*, a duly authorized collective bargaining representative exists, labor-employer activities are not entirely immune from the anti-trust laws. The history of labor exposure to anti-trust liability has not been ideologically and homogeneously consistent, but certain standards have been articulated by the courts which can be applied to the present factual context. *See generally*, 7 J. O. von Kalinowski, Anti-Trust Laws and Trade Regulation, §§ 48.01 et seq., pp. 48–1 to 82 (1971), and the references cited therein.

In United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), the Supreme Court sought to adumbrate the outer perimeters wherein labor unions would not be prosecuted under and insulated from the regulations of the Sherman Act. In order not to lose this exemption, the two caveats imposed by the Court were that the "union acts in its self-interest and does not combine with non-labor groups". 312 U.S. at. 232, 61 S.Ct. at 466.

The latter limitation enunciated in *Hutcheson* was reinvigorated in Allen Bradley v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, rehearing denied, 326 U.S. 803, 66 S.Ct. 11, 90 L.Ed. 489 (1945). In *Allen Bradley*, the Supreme Court declared the union activities to be in contravention of the Sherman Act when the union combined with all local contractors and manufacturers to restrain trade in and monopolize the supply of electrical equipment in the New York City area. While undoubtedly the "hot cargo" clause contained in the collective bargaining agreement furthered the union interests, the Court held that " . . . Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services." 325 U.S. at 808, 65 S.Ct. at 1539. Moreover, the Court continued, " . . . when the unions participated with a combination of business men who had complete power to eliminate all competition among others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts." 325 U.S. at 809, 65 S.Ct. at 1540. Finally, the Court remarked:

"The primary objective of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly. It would be a surprising thing if Congress, in order to prevent a misapplication of that legislation to labor unions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective. For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves." 325 U.S. at 809–810, 65 S.Ct. at 1540.

The Supreme Court was again presented the opportunity to examine the *Allen Bradley* doctrine in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626

---

pose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

(1965). The Court reaffirmed the labor exemption position previously adopted in *Allen Bradley* and made it indisputably clear that " . . . [a collective bargaining] agreement resulting from union-employer negotiations is [not] automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining, regardless of the subject or the form and content of the agreement." 381 U.S. at 664–665, 85 S.Ct. at 1590.

■ In invalidating the wage scale the union sought to impose on all the coal mine operators in *Pennington*, the Court further stated "there are limits to what a union *or an employer may offer or extract* in the name of wages, and because they must bargain does not mean that the agreement reached may disregard other laws." (Emphasis added.) 381 U.S. at 665, 85 S.Ct. at 1591. Unions (and derivatively, employers) will not be shielded from the enforcement of anti-trust legislation against them when they do not act alone and function in concert with non-labor groups to effectuate their labor goals and policies. See, also, Ramsey v. United Mine Workers, 265 F.Supp. 388 (E.D.Tenn.1967), aff'd 416 F.2d 655 (6th Cir. 1969) (en banc), rev'd on other grounds 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971); South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767 (6th Cir. 1970), cert. denied 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971), rehearing denied 404 U.S. 877, 92 S.Ct. 28, 30 L.Ed.2d 124 (1971).

While the Union activities in Meat Cutters Local Union 189 v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L. Ed.2d 640 (1965), were held to be outside the scope of the Sherman Act, the National Hockey League (the employer) is not a beneficiary of that decision in behalf of the union. First, the Court in *Jewel Tea* noted there was no claim raised of union-employer conspiracy, and, second, the collective bargaining dispute related to an area in which the union had forcefully negotiated:

"Thus the issue in this case is whether the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through *bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of* or in combination with non-labor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act." (Emphasis added.) 381 U.S. at 689–690, 85 S.Ct. at 1602.

"The crucial determinant is not the form of the agreement—e. g., prices or wages—but its *relative impact* on the *product market* and *the interests of union members*." (Emphasis added.) Footnote 5, 381 U.S. at 690, 85 S.Ct. at 1602.

■ From my examination of the foregoing cases, several conclusions can be drawn. First, those cases all involved situations where the union had been sued for its active, conspiratorial role in restraining competition of a product market, and the union, not the employer, sought to invoke the labor exemptions. Here there is no evidence that the Players' Association was a joint-conspirator with the National Hockey League in creating and retaining the reserve clause. The evidence establishes the Players' Association's persistent opposition to the present form of reserve system. The reserve clause, in fact, was more than a sturdy teenager when the Players' Association was born. The reserve clause was fathered by the NHL, and the Players' Association has repeatedly sought to exclude it in its present form.[19]

Second, the cases cited above pertained to issues which furthered the interests of the union members and on which there had been extensive collective

19. See Findings of Fact 106–111, *supra.*

bargaining. Again, that is not true in this litigation. The National Hockey League has not come forward with any substantial evidence which could warrant this Court finding that the reserve clause—as it presently operates in conjunction with the other interlocking agreements—was ever a subject of serious, intensive, arm's-length collective bargaining. When the Players' Association was recognized in 1967, some variation of the reserve system had existed for probably sixteen years prior thereto. Subsequent efforts by the Association to markedly revamp the reserve system have been continually rebuffed by the NHL. The discussions revolving around the Arbitration Agreements related only to resolving salary disputes, and did not in any way alter or affect the basic perpetual option of the reserve system.[19A]

Finally, even if, *arguendo,* there had been substantial arm's-length collective bargaining by the National Hockey League and the Players' Association to revise the perpetual option provision of the reserve clause (see, e. g., Exhibits D–59–64; D–2, ¶ 10, App. A; and D–129, p. 50), those negotiations would not shield the National Hockey League from liability in a suit by outside competitors who sought access to players under the control of the National Hockey League.

"A stronger argument might be made by a newly-formed league that a collective agreement between an established league and players' union which, for example, permitted suits for injunction against players who attempted to 'jump' leagues, was designed to prevent the new league from gaining access to the best players and to consign it permanently to second class status. This claim is similar to the one which succeeded in Allen Bradley: a union-employer combination to exclude entry by newcomers." (Jacobs and Winter, "Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage," 81 Yale L.J. 1, 28 (1971).)

■■ Even if the benefits of the labor exemptions can be extended to encompass the employer's activities, that outcome is not changed merely because the employer is a member of a multi-employer association. A multi-employer, group will not be accorded any greater protections than a single employer. Though a multi-employer organization will be insulated from unfair labor practice prosecutions only if it acts in good faith and takes only the limited steps necessary to protect itself, see, e. g., NLRB v. Truck Drivers Local 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957), however, restraining, anti-competitive acts will not be immunized from the Sherman Act. Cf. Kennedy v. Long Island R. R., 319 F.2d 366, 370–373 (2nd Cir. 1963), cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963); Prepmore Apparel, Inc. v. Amalgamated Clothing Workers of America, 431 F.2d 1004, 1007 (5th Cir. 1970), cert. dismissed by consent, 404 U.S. 801, 92 S.Ct. 21, 30 L.Ed.2d 34 (1971). While the employer activities in the two latter cases were not subject to the Sherman Act, the Courts clearly intimated that employer efforts to monopolize a particular product market would not be similarly treated.

In providing a special exemption from Sherman Act regulations for labor unions and employers who in good faith negotiated with those unions, Congress attempted to accommodate what frequently were conflicting public policies: the fostering and preservation of competitive business conditions in a free enterprise system on one hand, counterbalanced by a legitimate concern in improving and bettering the working conditions of laborers and the reduction of industrial strife through vigorous union organization and collective bargaining. The labor exemption which could be defensively utilized by the union and employer as a shield against Sherman Act proceedings when there was bona fide collective bargaining, could not be seized

---

**19A.** See Findings of Fact 77–111, *supra,* and discussion at pages 505–509, *infra.*

upon by either party and destructively wielded as a sword by engaging in monopolistic or other anti-competitive conduct. The shield cannot be transmuted into a sword and still permit the beneficiary to invoke the narrowly carved out labor exemption from the anti-trust laws. To allow and condone such conduct would frustrate Congress' carefully orchestrated efforts to harmoniously blend together two opposing public policies.

In sum, the National Hockey League, as it stands before me in the instant action, is not the most ideal candidate to be a beneficiary of the labor exemptions. The National Hockey League itself was primarily responsible for devising and perpetuating a monopoly over the product market of all professional hockey players via the reserve system. Not only did it enforce and implement its restraints against players and member clubs of the National Hockey League, but, moreover, it sought to enforce it against outside competitors who wanted to enter the competition at the professional level.

I reject the argument that an employer (National Hockey League) can conspire with or take advantage of a union to restrain competition and seriously impair the business dealings and transactions of competitors. To grant the National Hockey League an exemption in this proceeding would undermine and thwart the policies which have evolved over the years in disposing of labor-management and anti-trust disputes. I cannot compatibly reconcile the National Hockey League's monopolistic actions here with the labor exemptions from the Sherman Act. The NHL can do no more than could the employers and union in *Allen Bradley, supra.* Even if the National Hockey League was primarily concerned about the welfare of its players, its purported good intentions would be insufficient to insulate its actions. As the Supreme Court so aptly stated over twenty years ago:

"[B]enefits to organized labor cannot be utilized as a cat's-paw to pull

employers' chestnuts out of the anti-trust fires." United States v. Women's Sportswear Mfg. Ass'n., 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).

For the foregoing reasons, the National Hockey League cannot invoke the labor exemptions and is thus subject to a prosecution under the Sherman Act.

## IV.

### THE RELEVANT MARKET

#### A. RELEVANT PRODUCT MARKET

The phrase "any part of the trade or commerce" in § 2 of the Sherman Act is the provision which mandates inquiry as to the relevant market. In United States v. Grinnell, 384 U.S. 563, 573, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966), the Court stated:

"We see no reason to differentiate between 'line' of commerce in the context of [(§ 7 of)] the Clayton Act and 'part' of commerce for purposes of [(§ 2 of)] the Sherman Act."

Thus, in the formulation of the legal standards which control the determination of product market, both § 2 Sherman Act cases and § 7 Clayton Act cases will be cited.

In the leading case discussing relevant product market, United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the Supreme Court stated:

"The varying circumstances of each case determine the result. In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." 351 U.S. at 395, 76 S.Ct. at 1007.

The test of "reasonable interchangeability" relied on in *DuPont*, was reaffirmed in Brown Shoe Company v. United States, 370 U.S. 294, 325, 82 S.Ct.

1502, 1523–1524, 8 L.Ed.2d 510 (1962), where the Court noted:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined, submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." [20] (Footnotes and citations omitted).

The NHL argues that the relevant market for anti-trust purposes should include at a minimum both major league professional hockey and minor league professional hockey. Further, the NHL urges that from a realistic view of hockey the relevant market should be expanded beyond the professional and semi-professional leagues to include also the amateur leagues. In contrast, the WHA asserts that the relevant market is only major league professional hockey, namely the hockey played today in the National Hockey League. I find that the relevant market is major league professional hockey. (Findings 19–49, *supra*.)

The rationale of International Boxing Club v. United States, 358 U.S. 242, 249–250, 79 S.Ct. 245, 250, 3 L.Ed.2d 270 (1959), is decisive here. From the vastness of innumerable boxing contests, the Court isolated as a relevant market championship boxing contests. They noted the common denominators of all boxing contests, whether championship or not, were: one ring, two boxers, and a fight under a similar set of rules, before a greater or lesser number of spectators. But, in spite of the apparent "physical identity of the product" [21], the determinative difference in championship bouts was money: more revenue from (1) more spectators, (2) television rights, (3) movie rights, and (4) higher ticket prices.

Similarly, any hockey match whether in the NHL, the minor professional hockey leagues, or in the amateur leagues always includes one hockey rink, 12 hockey players, two referees, and a similar set of rules, before a greater or lesser number of spectators. That major league professional hockey is the relevant product here is substantiated by my Findings 17–49, *supra*, of higher ticket prices, increased television revenues, and greater players' *skill* and *salaries*.

Of course, the consumer is no longer king in sports; he has lost the unilateral power to demand and always get high quality competition. Yet, though his voice is weak, he is not totally impotent. He can withdraw his support when the level of performance becomes so outrageously low that he feels the admission price does not justify the quality of performance observed. There is a point where even avid fans will not support minor league performances for major league prices. This residuum of discretion in the sports fan to refrain from paying high prices for low performance is an additional factor in separating the minor leagues from the major professional league market.

A review of the record convinces me that above all else, the NHL owners are probably more shrewd as businessmen than they are as enthusiasts of sports. It is inconceivable that they would pay

---

20. *Accord*, Case-Swayne Co. v. Sunkist Growers, Inc., 369 F.2d 449, 454–456 (9th Cir. 1966).

21. International Boxing Club v. United States, *supra*, 358 U.S. at 249, 79 S.Ct. at 250, citing Brown Shoe Co. v. United States, 370 U.S. 294, 335–337, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962).

much larger salaries to major league players for any reason other than the fact that these players are more skillful, generally have more professional hockey experience, and as a group at least in the profits returned to the owners are worth the salaries paid. This profit pattern of payment to the players conclusively establishes that major and minor league hockey players are not interchangeable products. Thus, viewing the evidence from the required "pragmatic, factual approach"[22] I have evaluated the industry in terms of the "commercial realities"[23]. I hold that there is no competent evidence from which a court could even infer that semi-professional leagues and the NHL compete with respect to players. I find the relevant product market to be major league professional hockey as it is currently played in the NHL.

## B. RELEVANT GEOGRAPHIC MARKET

In Brown Shoe Co. v. United States, 370 U.S. 294, 336–337, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962), the Supreme Court articulated the requirements for selecting the appropriate and relevant geographic market. The Court noted as follows:

"The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market . . . (citations omitted.) Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both 'correspond to the commercial realities' (footnote omitted) of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area."[24]

In the context of a § 7 Clayton Act case, the Supreme Court commented in United States v. Pabst Brewing Co., 384 U.S. 546, 549, 86 S.Ct. 1665, 1667–1668, 16 L.Ed.2d 765, that relevant geographic market need not be proven

". . . in the same way the corpus delicti must be proved to establish a crime. . . . This phrase [any section of the country] does not call for the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground."

■ The record establishes that almost all of the hockey players currently playing in the NHL, began their skating careers in either Canadian or United States amateur hockey. The typical players' journey to the "big league" carried them through at least one of the five semi-professional leagues which play throughout the United States and Canada. Further, the NHL and WHA have teams at the present solely in the United States and Canada. Against this factual background presented by the plaintiffs, the defendants urge that the plaintiffs have available a potentially large source of supply of European players. However, in order to be guilty of monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2, the WHA need not prove that the NHL has an international monopoly in the hockey players' market. The language of the Sherman Act itself does not require a monopolization of *all* the trade or commerce, but rather *any part* of the trade or commerce among the several states or with foreign nations.

Applying the principles of *Brown Shoe* and *Pabst* to the facts of the instant case, I find that the relevant geographic market here is the United States and Canada.

22. Brown Shoe v. United States, *supra.*

23. *Id.*

24. *See* 1 J. O. von Kalinowski, Anti-Trust Laws and Trade Regulation, § 8.02(2)(b), at 8–25 to 29, (1971).

## V.

### THE SHERMAN ACT—§ 1

In arguments and briefs before this Court, the WHA has vigorously taken the position that the practices of the NHL constitute *per se* anti-trust violations within the meaning of § 1 of the Sherman Act, 15 U.S.C. § 1.[25]

The WHA presents a not insubstantial case in support of its contentions that the totality of actions of the National Hockey League constitute a clear violation of § 1 of the Sherman Act.[26] The WHA's legal analysis of § 1 could never be categorized as one which is clearly without merit. However, I find that because of the nature of the hockey sports industry, and the relative paucity of litigation on this type of reserve clause[27] that I should refrain from making a ruling at this preliminary injunction stage as to the § 1 Sherman Act issues.

"At this stage of the proceedings the Court is governed by the familiar rule that a preliminary injunction should be viewed with caution and only granted in those clear cases where there is a substantial probability of eventual success. Thus, '. . . where difficult questions of law and fact are in dispute . . . it is established law of this District and Circuit that a preliminary injunction will not issue . . .' . . . Accordingly, it has been said that '. . . to doubt is to deny.'" Graham v. Triangle Publication, Inc., 233 F. Supp. 825, 829 (E.D.Pa.1964), aff'd, 344 F.2d 775 (3rd Cir. 1965.)

On the basis of the present record as to the § 1 issues, I have some doubts on the WHA's probability of ultimate success. The sports field is in some ways a hybrid, in that it is both similarly and dissimilarly affected by the normal economic variables governing business success. For a corporation producing aluminum, any entrant in the field is a competitor. From a traditional oligopolist's or monopolist's view, one might consider any new entrant as an adversary and thus undesirable. But by the nature of a sports contest, there must always be an adversary. By analogy, who would enjoy Vida Blue blazing

---

25. § 1 of the Sherman Act provides in relevant part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . ."

*E. g.* United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L. Ed.2d 741 (1959); Fashion Originator's Guild v. F. T. C., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *see generally,* L. B. Schwartz, Free Enterprise and Economic Organization (1972), pp. 1–117.

26. There are other § 1 Sherman Act cases decided in the context of the sporting arena. *Cf. e. g.,* Haywood v. National Basketball Ass'n, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971) (Justice Douglas as Circuit Justice); Denver Rockets v. All-Pro Management, 325 F. Supp. 1049 (C.D.Cal.1971); Deesen v. Professional Golfers' Ass'n, 358 F.2d 165 (9th Cir. 1966). *See generally,* J. O. von Kalinowski, Anti-Trust Law and Trade Regulation, §§ 50.01, et seq., at 50–1 to 26 (1971).

27. At the final injunction stage, the NHL reserve clause has never been considered by a Federal Court. It has been considered in two preliminary injunction proceedings in which an NHL club sought enforcement of the NHL reserve clause to prevent a player from playing with a WHA team. Boston Professional Hockey Assn., Inc. v. Cheevers & Sanderson, 348 F.Supp. 261 (D.Mass.1972), remanded, No. 72–1328 (1st Cir. Oct. 10, 1972); Nassau Sports, Ltd. v. Hampson, et al., No. 4–72–Civ. 466 (D.Minn. Oct. 11, 1972). Judge Caffrey in Boston Professional Hockey Assn., *supra,* in denying the requested preliminary injunction noted: ". . . it would be unrealistic to rule that the Bruins have sustained their burden of showing that there is a possibility that this tangled web of legal instruments will not be found to restrain trade in professional hockey." It is thus necessary to reason by analogy to other sports cases. *Cf.* Flood v. Kuhn, 316 F.Supp. 271, 275–276, 282–284 (S.D.N.Y.1970); *see* cases cited n. 28, *infra.*

strikes across home plate when the batter's box was empty, or Mark Spitz' triumphs, if he were the only one in the pool. Sports teams need competition, and if there are more than two teams, some type of league is probably desirable.

For maximum customer receptivity and profit it is in the best interest of any club that its opponents not generally be viewed by the public as totally incompetent and utterly unable to compete effectively. For if the latter occurs, thousands of customers will not spend their dollars for tickets to view hundreds of games when the contest seems to present no more of a challenge than an ant confronting an elephant. Thus, if it is not possible to keep the competitive challenge of all teams within some reasonable parameters, some type of intraleague reserve clause or system may be desirable and in fact necessary.

As one author has noted:

". . . (T)he anti-trust laws should not be interpreted to prevent the professional teams from making agreements necessary for the industry to function, even where the agreements come within categories labeled illegal *per se.* *However, recognition that player restraints of some sort are necessary and justified does not mean that all features of the present system should be held immune from anti-trust attack.* Indeed, where defenses are allowed for restraints which would otherwise be summarily condemned, it is appropriate for Courts to require not only convincing evidence that the restraint genuinely promotes the ends asserted to justify it, but also that

these benefits could not be obtained by devices with less anti-competitive potential." [28] (emphasis added)

After extensive testimony from experts in football, basketball, and hockey, Judge Cooper concluded that some type of reserve system is desirable and essential for the maintenance of a baseball league. Flood v. Kuhn, 316 F.Supp. 271, 275–276, 282–284 (S.D.N.Y.1970). For these reasons and doubts, I refrain at this preliminary injunction stage, from making a finding as to whether the NHL's present rserve clause is a clear violation of § 1.[29] Yet I am not implying that after a full hearing for a final injunction that I would then hold that the present reserve clause is valid under § 1 of the Sherman Act. I merely hold *now* that I desire a fuller record before making judgment on the § 1 Sherman Act issue.

## VI.

### THE SHERMAN ACT—§ 2

While I have doubts as to whether the WHA will ultimately succeed on the § 1 grounds, and though I would deny a preliminary injunction if the only claim rested on § 1, I have *no* such doubts as to whether § 2 requires preliminary injunctive relief.

The WHA charges that the NHL has through a series of agreements and other concerted actions monopolized, conspired to monopolize, and attempted to monopolize major league professional hockey by (1) controlling the pool of players capable and available to play major league professional hockey, and (2) expanding the NHL so as to exclude the

---

28. Note, The Super Bowl and the Sherman Act: Professional Team Sports and the Anti-Trust Laws, 81 Harv.L.Rev. 418, 422 (1967). *See* Jacobs & Winter, Antitrust Principles and Collective Bargaining: Of Superstars and Peonage, 81 Yale L.J. 1 (1971). *Cf.* Silver v. New York Stock Exchange, 373 U.S. 341, 348–349, 83 S.Ct. 1246, 1252, 10 L.Ed.2d 389 (1963) ; Note, Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason, 66 Columbia L.

Rev. 1486 (1966). *Compare:* Deesen v. Professional Golfers' Association of America, 358 F.2d 165 (9th Cir. 1966) *with* Washington State Bowling Proprietors Ass'n., Inc. v. Pacific Lanes, Inc., 356 F.2d 371 (9th Cir. 1966) *and* Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049 (C.D.Cal.1971).

29. Of course, if an appellate court is free from doubt, there is a substantial record and findings as to the impact of the NHL reserve clause.

WHA from participation in major league professional hockey.

The analysis begins with § 2 of the Sherman Act, 15 U.S.C. § 2 which provides in relevant part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, . . ."

The Supreme Court's most recent pronouncement precisely delineating the elements of a § 2 violation is United States v. Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), where the Court stated the following:

*"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acument, or historic accident."* (Emphasis added.)

To determine whether the WHA has shown that the NHL falls within the test articulated in United States v. Grinnell, *supra,* one must first understand the history and impact of the reserve clause and the various arbitration agreements.

## A. THE RESERVE CLAUSE—ITS HISTORY AND APPLICATION

In Findings of Fact 77–111, *supra,* a concerted effort was made to outline objectively and accurately the precise details concerning the history of Clause 17 of the Standard Player's Contract, including (1) the nature and operative scope of the reserve clause prior to 1969 (when the negotiations pertaining to the arbitration of salary disputes were commenced); (2) the effect of any purported modifications to Clause 17 subsequent to 1969, viz., the addition of the Arbitration Agreements executed by the NHL and the NHL Players' Association on August 20, 1971, and March 29, 1972, and the inter-relationships of these agreements to the other provisions of the Standard Player's Contract; and (3) the extent of any collective bargaining on Clause 17 independent of the arbitration negotiations, more specifically, negotiations which modified the basic perpetual option of the reserve clause.

An examination of the record discloses that prior to 1969 the only mechanism existing for the resolution of salary disputes when the player and the respective NHL member team were unable to mutually agree, would be for the President of the NHL, Clarence Campbell, to serve as the final arbiter. [Finding of Fact 94, *supra*; attached Exhibit D–3, ¶¶ 17 and 18, in Exhibit D–1 (Campbell).] Prior to 1969, there were no contractual impediments whatsoever to the NHL club having and exercising a perpetual option over any player once he had been drafted by a NHL team and had signed a Standard Player's Contract. It is unequivocally clear that, in view of the monopolistic power of the NHL, this arrangement would have violated Section 2 of the Sherman Act, since a player, for his entire professional career, would be contractually bound to play for the team which then held his contract.[30]

Prior to 1969, the operation of Clause 17 would have permitted the club to tender to the player a new contract every year, and that player would be required to sign, with any dispute over salary to be ultimately decided by the President of the NHL. Any dispute apart from salary would also be finally determined by the President of the NHL, as authorized by Clause 18 of that same Standard Player's Contract. It is therefore necessary to examine the events since 1969 to determine whether any subsequent, alleged modifications of Clause 17

30. See pp. 509–513, *supra.*

have diluted its previously, fatally defective, anti-competitive effects.

The facts, as delineated in the Findings, *supra*, will not be repeated here, except only to clarify and emphasize some particular facts which I regard as significant and which are not readily obvious to the reader. An example of such a fact, as explicated in Findings 92–98, *supra*, is that although between 1969 and 1972 negotiations occurred on the issue of the arbitrability of salaries, it was not until June, 1972, that any of the Standard Player's Contracts formally reflected and incorporated the requirement that an independent arbitrator would conclusively decide salary disputes. Compare ¶ 17 of attached Exhibits D–3 (the 1969 Standard Player's Contract) and D–4 (the 1970 Standard Player's Contract) in Exhibit D–1 (Campbell), with ¶ 17 of attached Exhibit D–5 (the June, 1972, Standard Player's Contract). In 1969, as previously noted, the President of the NHL ultimately decided salary. In 1970, the Standard Player's Contract stated salary was to be determined by mutual agreement.

Looking only to the language of the 1970 Standard Player's Contract, one can alternatively conclude that, rather than being mandatorily compelled to submit to arbitration, the President of the NHL, pursuant to ¶ 18, could decide salary, as in 1969.[31] Thus, with that construction, when one examines only those provisions which have been actually embodied in the 1970 Contract, and read ¶ 18 together with ¶ 17, then the 1970 Contract, in terms of its scope and indefinite duration, is precisely identical to the 1969 Contract in all material respects. If the existence of a mechanism to determine compensation is deemed to be legally dispositive as to whether there is a valid, enforceable contract, then such a scheme did, in fact, exist. The "right to renew" aspect of Clause 17, therefore, continued to operate in 1970 uncurbed and unrestrained and, consequently, was equally violative of Section 2 of the Sherman Act due to the same vitiating, anti-competitive results discussed above. While this fact will be reiterated below, the 1970 version of the Standard Player's Contract was the form utilized during the 1971-1972 playing season. [Finding 83, *supra*.]

To continue this chronology of events since 1969, one has to specifically focus on the two Arbitration Agreements executed between the NHL and the NHL Players' Association, and ascertain in what ways, if any, was the Standard Player's Contract altered or modified and thus arguably curing any anti-trust defect. More important, however, attention must be directed to the allocation of authority vested in the NHL Players' Association by the players.

Although some aspects of the labor relations history of the NHL and the NHL Players' Association were covered in the discussion concerning the applicability of the labor exemptions from the Sherman Act, the treatment there only highlighted some of the various collective bargaining sessions. It becomes essential then that this history be further clarified to the extent possible given the current record before me.

Initially, it should be stressed that the labor relations history between the NHL and the NHL Players' Association has often proceeded in a most informal fashion in terms of the failure to execute "formalized" agreements. As an example, Charles Mulcahy, the NHL owner-representative to the NHL Owner-Player Council, while discussing the method of operation of that Council, stated: "The history of hockey has been on a handshake basis, and if I tell you something, I am not going to go back on my word. . . ." [Exhibit D–125, p. 4–35.] It was his understanding that such oral agreements could be regarded as provisions of a player's contract even though unrecorded and not specifically ratified by any particular player. [Exhibit D–

---

31. See discussion of the effect of the 1971 and 1972 Arbitration Agreements, *infra*, at pages 507–509.

125, pp. 4–11 to 4–13; 4–21 to 4–22; 4–33 to 4–35.]

Mr. Alan Eagleson, Executive Director of the Players' Association, testified before the Senate Commerce Committee on June 28, 1972, that:

> "There is no formal collective bargaining agreement as such between the members of the Players' Association and the League. For purposes of direct discussion between players and owners, the format of our negotiations with the owners includes a Player-Owner Council."

[Exhibit F, p. 481, attached to Exhibit D–1 (Campbell).]

Mr. Eagleson has further testified:

> "The aim of the [A]ssociation is to eventually extend that arbitration [of salary disputes] to include an independent arbitration of all problems between players and owners. But it is a first step. And in this fashion we feel that it gives the club perhaps a little better advantage, but gives the players significant advantage over what—over the position he has previously been in. Because a player can still say, all right, that is the position of my association, and my association has agreed that the arbitration will be binding, but I may decide after having heard the decision on arbitration to say to hell with my association and the owners, I am not going to play for that kind of money.

> "This happened, I think, only on one occasion, and it only lasted for a matter of a day and a half before we were able to express to the player that, look, fair ball is fair ball. As a result, things have gone rather smoothly in the past two years in this year."

[Id. at p. 486.]

With such nebulousness, it is impossible to reconstruct the full context of the relationship of the parties and the binding effect, if any, of their agreements. Because of the informality of these discussions, some agreements have been finalized by a handshake, may of them have never been reduced to writing. Therefore, in view of this past cloudy collective bargaining history, the various parties may honestly reconstruct their "understanding" of these transactions differently.

In considering the impact the Arbitration Agreements have wrought upon the Standard Player's Contract, as well as examining the legal significance of any collective bargaining negotiations, I recognize that, at a minimum, one is always dealing with a quadripartite relationship:

(1) The National Hockey League (which presumably can speak for the owners);

(2) The NHL Players' Association (which purportedly speaks for the players *en masse*);

(3) A specific individual hockey player, who has his own specific contract with a single identifiable club; and

(4) A particular NHL team which has drafted certain players and negotiated individual contracts with each player.

 Thus, the critical issue before me is whether any agreement reached by the National Hockey League Players' Association and the NHL teams is legally binding on an individual hockey player so that *it modifies his currently existing contract to incorporate those new terms.* I find that unless the individual player has specifically agreed to the amendment of his current contract, the March 29, 1972 Arbitration Agreement executed between the NHL and the NHL Players' Association is *not* legally binding on an individual player and, hence, does not modify his current contract.[32]

---

32. While I do not here separately discuss the effect the "temporary" August 20, 1971 Arbitration Agreement had on the then existing, individual Standard Player Contracts, I hold that this 1971 Agreement similarly did not automatically modify existing contracts unless there was explicit, individual player ratification of that Agreement. See the discussion appearing below regarding the effect of the March 29, 1972 Arbitration Agreement.

Of course, a player may ratify the agreement of the Players' Association and the Club owners, but absent precise ratification, I find that any agreement between the Players' Association and the owners does not result in an automatic modification of a pre-existing, specific player's contract.[33] If one were to permit the Players' Association and the NHL to possess such power to amend an individual's current contract without the individual's express authorization or express ratification, one can imagine a player's one-year contract being extended for an indefinite period of time beyond the player's expressed original intent. An illustration of the dilemma confronting a player signing such a contract is appropriate. If it is assumed a player has signed a contract which, according to its express terms, has a duration of one year, were I to accept the NHL's contention that independent collective bargaining negotiations can modify existing player contracts, then that one-year contract has been extended for a minimum of an additional three years without the player's consent. As stated in Finding 100, *supra,* some of the NHL officials have recognized the possibility of the Players' Association and the NHL extending the 1972 Arbitration Agreement beyond the present 1975 expiration date.

◼ Even if, *arguendo,* the 1972 Arbitration Agreement is automatically incorporated into an existing individual player's contract and is not solely a device for determining salary,[34] and even if the 1972 Arbitration Agreement expires in 1975 without having been extended by the NHL and the NHLPA (thus arguably making the reserve clause unenforceable after 1975 because no mechanism will then exist for determining the amount of compensation) I hold that in the circumstances of this case, the three year restraint following the expiration of a current contract[35] (considering this factor along with the other numerous interlocking agreements NHL has fashioned and shaped over the years to monopolize a hockey player's professional career) is unreasonable, and in violation of Section 2 of the Sherman Act.[36]

33. It should be further noted that no NHL official has been able to refer to any *written* document which precisely states that an agreement (materially altering the terms of a contract) between the NHL and the NHLPA is automatically incorporated into an existing player contract.

34. Of course, I have found that the 1972 Arbitration Agreement (1) does not automatically modify a pre-existing, individual player's contract, and (2) is solely a device for determining salary. [Findings 85–87, 97.]

35. By "current contract," I am referring to those individual player's contracts which have not been renegotiated and signed expressly incorporating the terms of the March 29, 1972 Arbitration Agreement.

36. I make this holding solely because of the present monopolistic power of the NHL, coupled with its intent to exercise that power as further described at pp. 509–513, *infra.*
As a practical matter, my holding that the 1972 Arbitration Agreement does not modify existing contracts, affects only those players whose contracts (1) were in effect on March 29, 1972 (when the Arbitration Agreement was executed); (2) were not specifically renewed or renegotiated by the individual player subsequent to March 29, 1972; and (3) according to the express terms of that existing contract, it would have expired on September 30, 1972, but for the existence and enforcement of the reserve clause. By reason of the NHL Standard Player's Contract as promulgated in June 1972, the aforementioned three year arbitration agreement has been included and incorporated by reference and, thus, any player who signed such a contract (commencing October 1, 1972) automatically adopts, ratifies and accepts the terms of the March 29, 1972 Arbitration Agreement. As stated in Findings 83, 89, 97, and 211, *supra,* all of the players who have signed contracts with the WHA had NHL contracts which expired on September 30, 1972, and these NHL contracts were neither renegotiated nor renewed.
I find it unnecessary in the context of a request for a preliminary injunction to decide either the validity or the enforceability of the 1972 Arbitration Agree-

Finally, as delineated in Findings 104–111, *supra,* apart from the collective bargaining negotiations relative to the arbitration of salary, there have been no modifications of Clause 17 of the Standard Player's Contract which have altered or eliminated the basic perpetual option which the NHL has over any hockey player once he has first signed a Standard Player's Contract.

### B. Monopoly Power

■ In view of the impact of the reserve clause, an additional issue for determination is whether the NHL possesses monopoly power in the relevant market.[37] In United States v. E. I. Du-Pont De Nemours & Co., *supra,* 351 U.S. at 391, 76 S.Ct. at 1005, the Court defined monopoly power as ". . . the power to control prices or exclude competition." [38]

Further, in American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S. Ct. 1125, 1139–1140, 90 L.Ed. 1575 (1946), the Court stated:

"The authorities support the view that the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded *but that power exists to raise prices or to exclude competition when it is desired to do so.*" (Emphasis added)

■ Here, through the use, *inter alia,* of (1) Standard Players' Contracts, including the "reserve clause" in paragraph 17 of that contract, (2) the agreements between the NHL and three of the major semi-professional leagues, and (3) the agreements between the professional and semi-professional leagues and the amateur leagues, it is clear that the NHL overwhelmingly controls the supply of players who are capable and available for play in a new league where the level of internal competitions fairly approaches the levels currently existing in the NHL. In an attempt to minimize the NHL's extraordinary degree of control over the players, the NHL asserts that there are many other available players who will shortly be able to play major league professional hockey. However, the relevant market place is the market place of *today,* not the market place of 1980 or even the market place of 1975. A monopolist may not today excuse his present predatory practices because someday in the future his total domination of the market place may be lessened.

The NHL's monopoly power is their power to control overwhelmingly the supply of hockey players who are today available for play in any major professional league. It is that total control by the NHL which I hold is proscribed by § 2 of the Sherman Act. One who builds the most modern steel mill cannot operate without an adequate supply of iron ore. The 50,000 amateur hockey players allegedly available to the WHA are not the "iron ore" from which viable competition can be built.[39] If the WHA is to compete effectively for attendance and television rights with commensurate payments, the WHA must have a "show" which is equal or nearly equal to that of the NHL today. Since the WHA is a newcomer, the quality of play need not instantly equal that of the NHL, but there must be a prospect that the product will be nearly equal in a relatively short period of time.

■ Of course, I recognize that the NHL has neither prevented the birth of the infant WHA nor has the NHL caused the WHA to sustain a premature

ment as it specifically affects those players who have renegotiated and signed in 1972 new NHL contracts containing the new arbitration terms. By my holding here, I do not mean to imply or intimate any view as to how that issue will ultimately be decided.

37. See pp. 500–502, *supra.*

38. *Accord,* United States v. Grinnell Corp., *supra,* 384 U.S. at 571, 86 S.Ct. at 1704.

39. Despite this purported reservoir of "natural" material, in its 1972 Amateur draft, the NHL found only 45 players suited for its needs [Exhibit D–2 (Swados), at pp. 14–15, Finding 29, *supra.*]

demise,[40] but monopoly power may be restrained before its full wrath is felt. *American Tobacco, supra.* The operation of the anti-trust laws need not be delayed until one is trying to almost resurrect the dead; these laws are designed to preserve living competitors. For all the above reasons, I find that the NHL possesses monopoly power in the relevant market as proscribed by *Grinnell, supra.*

### C. Willfulness & Intent

 The mere possession of monopoly power in the relevant market does not alone constitute a violation of section 2 of the Sherman Act, 15 U.S.C. Section 2.

There must also be

"(2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell, 384 U.S. 563, 86 S.Ct. 1698, 1704, 16 L. Ed.2d 778 (1966).

The activities of the NHL go beyond mere possession of monopoly power in the relevant market to breach these aforementioned prohibitions articulated in United States v. Grinnell, *supra.*

 The NHL has willfully acquired and maintained its monopoly power through the use of the many agreements detailed in Findings of Fact 35–89. Its continuing and overriding goal is to maintain a monopoly over the supply of major league professional hockey players.

The NHL employs devices such as reserve clauses, Standard Player Contracts, an NHL semi-professional league Joint-Affiliation Agreement,[41] and control over the amateurs through the Pro-Am Agreement in which the amateurs agreed to recognize the NHL as the "sole and exclusive governing body of professional hockey".[42] If the NHL reserve clause were valid for those players whose contracts terminated [43] in September, 1972, then the NHL would have the power, directly or indirectly, to prevent any player under "contract" to the NHL or one of its affiliated minor professional leagues from playing with any other team or league outside the NHL System.

Upon reading the self-serving tributes for its expenditure of millions of dollars to develop amateur and minor league hockey, one might infer that the millions were spent solely for the honor and glory of amateur and minor league hockey. The NHL's motives were not quite so noble; these expenditures to develop the amateur and minor professional leagues were essential to maintain the NHL's monopolistic position.

In American Football League v. National Football League, 205 F.Supp. 60 (D.Md.1962), aff'd 323 F.2d 124 (4th Cir. 1963), the plaintiffs there alleged that the defendant, N.F.L., had monopoly power in three specific areas,—(1) cities, (2) players, and (3) the sale of television rights. Here, the WHA does not claim that the NHL has monopoly power to prevent the awarding of WHA franchises in a particular territory or restrict the availability of television contracts. The WHA does contend that the NHL has total and complete control over the supply of capable players. In A.F.L. v. N.F.L., supra, 205 F.Supp. at 77, the Court noted:

"In 1959 the NFL had most of the ablest players under contract. However, colleges graduate annually large numbers of talented players, and, because after the season starts professional football rosters are usually lim-

---

40. The NHL stresses that only five suits have been filed to enforce the reserve clause. Here, however, success in any suit against any former NHL player would have a "chilling" effect on other NHL players contemplating playing in the WHA.

41. See Findings 71–76, *supra.*

42. See Findings 62–70, *supra.*

43. See pp. 507–509, *supra,* for analysis of the category of contracts which are held here to violate the Sherman Act.

ited to around 35 players, many good players are released each year after the training season and are available to be signed by clubs in any league. Moreover, NFL players become free agents after a period of years."

In contrast to the above picture of relative openness and availability of players in professional football, the NHL has a system which controls access to all professional and semi-professional players for at least three years. As my discussion, *supra*, concerning the reserve clause conclusively demonstrates, if the operation of the NHL's current reserve clause is not restrained, the NHL's control over the players is absolute for at least three years after the expiration of any current contract. Further, the value of the minor league professional hockey players as a source of supply to the major leagues is not the equivalent of college-level players in football. Moreover, the minor league professional hockey players are likewise bound by standard player contracts which contain reserve clauses materially identical to the NHL standard player contract. Finally, the general practice is that if a minor professional league player does not make the NHL team, nevertheless he is still bound by his former minor professional league contract and is thus *not* free to sign with another club or any other league. These differences between the football and hockey reserve systems are crucial.

Secondary evidence of the NHL's intent to maintain its control over professional hockey is its continuing policy of expansion tied to the increasing demand for hockey in the United States and also in Canada. Of course, if even this burgeoning interest in hockey in North America could nonetheless support only one supplier, then this court would be bound to conclude that the NHL enjoys a "natural monopoly". In Ovitron Corp. v. General Motors Corp., 295 F.Supp. 373, 378 (S.D.N.Y.1969), the Court noted "the natural monopolist is entitled to compete vigorously and fairly in a struggle for a market which *cannot support more than one supplier*." (emphasis added)

In Hiland Dairy Co. v. Kroger Co., 402 F.2d 968, 976 (8th Cir. 1968), the Court commented:

" . . . the only case condemning internal expansion is United States v. Aluminum Co. of America, 148 F.2d 416, 430 (2 Cir. 1945). This case is unique as the Aluminum Company had a present monopoly of the market, of 90 per cent . . . and had kept increasing its capacity to anticipate future needs so as to discourage and eliminate competition".

I hold the rationale of United States v. Aluminum Co. of America, 148 F.2d 416, 431 (2d Cir. 1945), is so similar to the instant case that the *Alcoa* Case should be quoted at length:

"The only question is whether it [Alcoa] falls within the exception established in favor of those who do not seek, but cannot avoid, the control of a market. It seems to us that that question scarcely survives its statement. It was not inevitable that it [Alcoa] should always anticipate increases in the demand for ingots and be prepared to supply them. Nothing compelled it [Alcoa] to keep doubling and redoubling its capacity before others entered the field. It [Alcoa] insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to manoeuvres not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent."

Keeping in mind both the many agreements employed by National Hockey League and its continuing expansion, it is apparent that the National Hockey League's intent is and was the willful acquisition and maintenance of a position as the only major professional hockey league in the United States and Canada. Again, the language of United States v. Aluminum Company of America, *supra*, is particularly appropriate. In that case, Judge Hand continued, 148 F.2d at 432:

> "In order to fall with § 2, the monopolist must have both the power to monopolize, and the intent to monopolize. To read the passage as demanding any 'specific,' intent makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing".

Here the NHL, like *Alcoa*, intended to keep, and did keep, a complete and exclusive hold upon the market of major league professional hockey players which the NHL acquired soon after its creation. The fact that the WHA is attempting to enter that market does not mitigate the instant WHA claims that the NHL currently enjoys monopoly power in the relevant market; for there is no evidence before me that under the present circumstances, the WHA will be an effective competitor.

The relevance of the *Alcoa* case to the expansion of an established professional sports league vis-a-vis a new entrant in the same professional sports field has been commented on by one author as follows:

> "Less clear, however, is the degree to which the older league may use its established position to compete vigorously against the new entrant when the result may be his destruction. Aluminum Co. of America v. United States (footnote omitted) may be read as holding that Alcoa's policy of expanding as fast as the market grew

was illegal; Alcoa—as a monopoly—apparently had a duty to leave part of the demand unsupplied in order to encourage competitors. If this somewhat extreme interpretation of *Alcoa* were followed, an existing league would be required to refrain from expansion into new cities or from increasing TV coverage when such actions would preempt part of the market which the new league sought to enter.

> "A strict application of the Alcoa principle might be particularly appropriate for professional sports. Where many somewhat dubious restrictive practices will probably be tolerated within leagues because courts are reluctant to reject expert arguments that they are necessary for survival of the sport, *encouragement of new leagues may be the only effective way to produce the expansion of the industry needed to meet growing demand.*" [44] (Emphasis added.)

The expansion of the NHL during the WHA's formative period and the creation of the WHA itself are both responses to an increased market for the sport and thus increased economic attractiveness for those entering as well as those already in the field.

Here, I do not rely solely on the expansion of the NHL to show that it had the intent to monopolize; for the President of the NHL, Clarence Campbell, has explained his league's intent as a determined drive to assure that the NHL is "the only major professional hockey league operating from coast to coast in the United States or Canada." (Finding 122, *supra*.)

Expansion of the NHL was one factor indicative of the wrongful intent of the older league to totally monopolize hockey and remain the only major professional hockey league operating within the United States, but expansion was only one of

---

44. 81 Harv.L.Rev. 418, 431. The Court in AFL v. NFL, *supra*, declined to follow this approach that expansion is prohibited because he there found that the NFL could not expand quickly enough to exclude the AFL and that the NFL did not have pervasive control over available players enjoyed today by the NHL.

the several threads spun in the monopolistic fabric of the NHL to blanket players from entry to another league.

# VII.

## PRELIMINARY INJUNCTIVE RELIEF

### A. STANDARDS FOR ADJUDICATING PRELIMINARY INJUNCTIVE RELIEF.

To warrant the preliminary injunctive relief requested pursuant to 15 U.S.C. § 26,[45] it is the plaintiff's burden to satisfy " . . . the four essential criteria:

(1) Irreparable harm to [applicants], absent such a stay;

(2) Absence of substantial harm to other interested parties;

(3) Absence of harm to the public interest; and

(4) A likelihood that [applicants] would prevail on the merits. .

Winkleman v. New York Stock Exchange, 445 F.2d 786, 789 (3rd Cir. 1971).[46]

In the context of a complex anti-trust case, the Court of Appeals emphasized:

" . . . preliminary relief is a serious remedy, (footnote omitted) and because application for such relief, particularly in a complex case, is often based on a record less comprehensive than that which a full adjudication would yield, the court has required that a plaintiff show a reasonable chance of ultimately prevailing on the merits. In an action by a private party, the plaintiff must also show that it will suffer irreparable injury unless relief is granted." [47]

Finally, it should be noted that a request for a preliminary injunction is also addressed to an ambit of discretion which must be carefully exercised by the district court.[48]

45. 15 U.S.C. § 26 provides in relevant part as follows:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the anti-trust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: . . . ."

Here, the procedure under § 26 is governed by Rule 65 of the Federal Rules of Civil Procedure, 28 U.S.C. Rule 65. The especially relevant portions of Rule 65 here are Rule 65(a) which mandates notice to the adverse party, Rule 65(c) which requires the posting of security by the applicant, Rule 65(d) which requires a court to state its reasons for the issuance of an injunction, and Rule 65(e) which provides that these rules

" . . . do not modify any statute of the United States . . . " Further, the Advisory Committee's notes to Rule 65(e) expressly state that 15 U.S.C., § 26 is continued in full force. See generally. 7 J. Moore, Federal Practice, ¶ 65.01, at 65–13 (2d ed. 1972)

46. Other cases to the same effect are: Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc., 414 F.2d 506, 511 (3rd Cir. 1969); Nelson v. Miller, 373 F.2d 474, 477 (3rd Cir. 1967); Graham v. Triangle Publications, Inc., 344 F.2d 775 (3rd Cir. 1965), aff'g 233 F.Supp. 825, 829 (E.D.Pa.1969); Indus. Electronics Corp. v. Cline, 330 F.2d 480, 483 (3rd Cir. 1965); United States v. Ingersoll-Rand Co., 320 F.2d 509, 523 (3rd Cir. 1963); Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3rd Cir. 1962); Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 268 F.2d 569, 573–574 (3rd Cir. 1959); and Sims v. Green, 161 F.2d 86 (3rd Cir. 1947).

47. Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc., 414 F.2d 506, 511 (3rd Cir. 1969).

48. Allis-Chalmers Mfg. Co., supra, 414 F. 2d at 516; United States v. Ingersoll-Rand Co., supra, 320 F.2d at 523; Sims v. Green, supra, 161 F.2d at 89.

Additionally, in Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc., *supra*, 414 F.2d at 510–511, the Court of Appeals for the Third Circuit in the context of a case involving a request for relief based on the anti-merger provisions of § 7 of the Clayton Act, 15 U.S.C. § 18, construed the injunction provision applicable here, § 16 of the Clayton Act, 15 U.S.C. § 26. The Court there held that a plaintiff's request for a preliminary injunction in an antitrust context is not subject to any special test; rather, the Court restated and applied the four requirements specifically noted above.[49]

■ In conclusion, the injunction sought under § 16 of the Clayton Act, 15 U.S.C. § 26 is not subject to any additional burdens over and above those generally governing the injunctive relief,—— what is required is that a Court not make a premature resolution of complex issues whose resolution is in doubt.

## B. THE IRREPARABLE HARM ISSUE

Like most terms in the law, irreparable harm is a word of art. For total comprehension, one must understand the full mosaic. In some instances, the damage, though painful is retouchable, measurable, and correctible. At other times, the magnitude of the damage might be beyond repair; then, since the mosaic cannot be later restored to the original potential, its value will be lost, if not for generations to come, at least for the indefinite future. The differences between the purported ("irreparable") harms which will be sustained if the WHA loses here might very well be the loss of any place in the gallery of major league professional hockey competition. While in contrast, if the NHL sustains a loss by the preliminary injunction here being granted, the NHL will still have both prominence *and* first place in this gallery, and even when losing, the diminution of its relative stature will be almost minor—a mere shadow far more calculable in precise damages and above all clearly not a destruction of the NHL's manifest first-place position.[50]

Preliminary injunctions have often been granted against dominant companies to keep open the source of supply to their competitors because the dominant concern was breaching the antitrust laws in its refusals to deal with competitors. Cf. McKesson & Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa.1964); Airfix Corp. of America v. Aurora Plastics Corp., 222 F.Supp. 703 (E.D.Pa.1963); Bergen Drug Co. v. Parke Davis & Co., 307 F.2d 725 (3rd Cir. 1962). Here if the NHL is not restrained from enforcing its reserve clause, the WHA will not have available an effective source of major league professional hockey players.

■ In determining whether the parties are sustaining irreparable harm, I must view the evidence through a lens opened to the "pragmatic factual approach" and set on the "commercial realities" required by the antitrust laws.[51]

---

49. Other cases holding that there are no special requirements for preliminary injunction under § 16 of the Clayton Act, 15 U.S.C. § 26 are: Teleflex Industrial Products, Inc. v. Brunswick Corp., 293 F.Supp. 106, 109 (E.D.Pa.1968), modified, 294 F.Supp. 256 (E.D.Pa.1968), vacated and remanded, 410 F.2d 380 (3rd Cir. 1969); N. W. Controls v. Outboard Marine Corp., 317 F.Supp. 698 (D. Del. 1970); Instant Delivery Corp. v. City Stores Co., 284 F.Supp. 941 (E.D. Pa.1968).

50. As to the NHL "This is not a case of the claimed destruction of a business enterprise containing such speculative elements that they are not susceptible to ready ascertainment in damages." Graham v. Triangle Publications, Inc., 344 F.2d 775–776 (3rd Cir. 1965).

51. Though the terms "pragmatic factual approach" and "commercial realities" were used in Brown Shoe v. United States, *supra*, and involved Section 7 of the Clayton Act, there is no reason to assume that pragmatic or commercial realities are not equally relevant to the Sherman Act.

### 1. *The Superstar Syndrome*

 The commercial realities here start at the box office. If the WHA is going to be a competitor in professional major league hockey, in the public's eye it must have a contest on ice which is not too dissimilar to the NHL; for in this milieu of customer receptivity, some superstars are essential—i. e. names recognized as either superstars or at least players whose fame is more than persistent sub-mediocrity. If in its present embryonic stage the WHA does not have some superstars to nurture and sustain the public interest, it will not become a viable competitor to the NHL. Thus, the preclusion of name players who have either superstar status or at least significant acclaim will cause the WHA irreparable injury for years—for without them the public will not generate substantial enthusiasm for the WHA, and such lack of enthusiasm causes lethargy at the box office.

The WHA has taken a calculated risk in stretching its starting base to twelve teams. Having taken that calculated risk, my findings do not suggest that they should be entitled to stock all 12 teams with superstars. It is not a question of total parity between the leagues, but rather the probability of *no* parity if all of the superstars (whose contracts terminated on September 30, 1972) are precluded from joining the WHA by reason of the reserve clause.

Like other competitive sports, major league professional hockey is an interesting phenomena. The superstar syndrome does not mean that for success each team must have a Bobby Hull—even if one were rash enough to assume, *arguendo*, that there are several Bobby Hulls. However, to be competitive there must be some Bobby Hulls or some players of extraordinary credentials among some teams in the WHA. For the presence of such players benefits the entire league. One might be supportive of the WHA even though his own local club is bereft of superstars and he observed only the stellar performers from other clubs vanquishing his home team.[52]

The owners of the WHA are no more philanthropic than the owners of the NHL clubs. The WHA recognized this commercial reality and the commercial necessity of the superstar when each WHA club agreed to pay a pro-rata share of the one million dollar bonus offered *and paid* to Bobby Hull for his acceptance of a contract with the Winnipeg Jets.

### 2. THE ROLE OF THE LESS THAN SUPERSTAR

While the superstar may be the coveted hero of the crowds, he does not win the game by himself. He may draw the most applause but he wears only two skates and six men comprise the team. Thus, the reserve clause has implications far beyond the availability of superstars, for if the average players are not also available, the team cannot survive. Again, this commercial reality has been recognized by the WHA.

As we have noted in Finding 189, presently more than 200 of the 345 players signed to WHA were subject to reserve clauses in the 1971–72 contracts with the NHL, AHL, CHL and WHL.

The NHL emphasizes that it has filed only five suits and then only against "superstars". But its selective enforcement of the reserve clause against key individuals gives it no more standing than one who pursues selective price fixing for only a few products. If the NHL is permitted to selectively enforce the reserve clause against players whose contracts expired on September 30, 1972, then the WHA will always be under the Sword of Damocles. It will never know when one of its promising players will

---

52. A case study in point might be the woes of the Philadelphia Eagles of the National Football League during the last several years.

be legally beheaded from active WHA competition because the NHL has dropped the sword and enforced the reserve clause.

### 3. THE BOND

I do not mean to imply that the NHL's loss of stellar stars is inconsequential or without damage—I am merely holding that it is not irreparable harm to the NHL. But because of the fact that I am mindful that it could cause some damage to the NHL if my ruling is wrong or is reversed by an appellate court, I am requiring a substantial bond of two and one half million dollars to be posted by the WHA as a condition precedent for the preliminary injunction's enforceability. Certainly, the WHA cannot complain of a bond in this amount when they are willing to pay a million dollars for even one player.

Rule 65(c) of the Federal Rules of Civil Procedure provides:

> "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an office or agency thereof." 28 U.S.C. Rule 65(c).

Professor Moore has commented:

> "The requirement of security is intended to protect the party restrained or enjoined, as the case may be, against 'costs and damages' incurred or suffered by the party wrongfully restrained or enjoined.

> "Bearing in mind the purpose of security, the amount of security is to be determined by the trial court in the exercise of sound discretion. Necessarily, if a restraining order is grant-ed at the beginning of an action, the amount of security adequate for a defendant's protection is a matter of estimate in light of the circumstances of the case and the fact that the duration of the restraining order is limited in time; even at the preliminary injunction stage the amount remains an estimate; although at this point the development of the case and the Court's decision to grant a preliminary injunction probably make the estimate less conjectural, even though the preliminary injunction has no fixed time limit to run. (Footnotes omitted.)[53]

The $2,500,000 bond which I require the WHA to post here is as precise a determination as I can make on the present record of the costs and damages which the NHL may suffer in the event it is determined that the injunction was improvidently issued. In Washington Capitol's Basketball Club, Inc. v. Barry, 304 F.Supp. 1193, 1203 (N.D.Cal.1969) the court required the plaintiffs to post a bond of $100,000.00 in a case contesting the status of only one basketball superstar, Rick Barry.

Here, the injunction restraining the NHL from enforcing or attempting to enforce its reserve clause is not a contest involving just one superstar. Rather; it is a dispute of a substantially larger magnitude. The superstars in issue are many,—Bobby Hull, Derek Sanderson, Gerry Cheevers, John McKenzie, to name just a few of the players whose former NHL clubs will be precluded from enjoying their services as a result of this injunction. However, the players directly affected include more than 200 players who but for the formation of the WHA and the issuance of this preliminary injunctive relief would still be obligated to play with the NHL if the reserve clause is valid.

### 4. THE HARM TO THE NHL

The NHL is no shaky institution which will collapse if it loses a few su-

---

53. 7 J. W. Moore, Federal Practice, ¶ 65.09, pp. 65–94 to 95 (1972).

perstars or even many average players during the pendency of this preliminary injunction. The NHL is merely sustaining the fate which monopolists must face when they can no longer continue their prior total dominance of the market. For the reality of today is that the federal antitrust laws preclude the continued implementation of NHL President Campbell's fondest dream that it remains "the *only* major professional hockey league operating from coast-to-coast in the United States [and] Canada".[54] (Emphasis added.)

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter under Sections 4 and 16 of the Clayton Act (15 U.S.C. Sections 15, 26) and 28 U.S.C. Section 1337.

2. The NHL and its member teams operate in interstate commerce and their actions described in the Findings of Fact affect interstate commerce within the meaning of the Sherman Act.

3. Professional hockey and professional major league hockey are subject to the anti-trust laws.

4. The part of commerce or "relevant market" upon which the conduct described in the Findings of Fact operates is professional major league hockey as it is currently played in the NHL. There exist sufficient disparities in the sale of tickets, hockey fan interest, and sale of broadcast rights to define a separate and distinct market in professional major league hockey as opposed to professional minor league or amateur hockey. The relevant geographic market is the United States and Canada.

5. The NHL and its member teams have combined *inter se* and with others through the NHL By-Laws and Constitution, the Joint Affiliation Agreement and the Pro-Amateur Agreement to establish and maintain the player reserve system embodied in Paragraph 17 of the Standard Player's Contract which perpetually[55] prevents any professional hockey player who has not signed a new 1972–73 Standard Player's Contract with either the NHL or the minor professional leagues (and who has not renegotiated a new 1971–1972 contract expressly incorporating the terms of the March 29, 1972 Arbitration Agreement) from freely negotiating for his services, not only within the NHL but also outside that league.

6. Even if the player reserve system embodied in Paragraph 17 of the Standard Player's Contract is held to be not a perpetual option, but instead is merely a prohibition for three years precluding any player (whose contract has expired on September 30, 1972, who has not renegotiated a new 1971–1972 contract expressly incorporating the terms of the March 29, 1972 Arbitration Agreement, and who has not signed a new 1972–1973 Standard Player's Contract) from freely negotiating for his services not only within the

---

54. See Finding of Fact 122, *supra*. As to the four criteria of Winkleman v. New York Stock Exchange, 455 F.2d 786, 789 (3rd Cir. 1971) and page 513, *supra*, the prior sections establish that (1) there would be irreparable harm to the WHA if preliminary injunctive relief were not granted, (2) that there is a relative absence of such substantial harm to the NHL. By my findings and conclusions of law that the NHL violates Section 2 of the Sherman Act it is clear that there is (3) "a likelihood that [the WHA] would prevail on the merits" on a final injunction hearing. As for the final factor in this four-tier test, it is indisputable that there is no "harm to the public interest" by granting the preliminary injunction. The public will have the advantage of seeing more players in more contests, and the elitism of the season ticket holders will be "checked" and more tickets will be available to that public which claims hockey is the game of the second half of the twentieth century.

55. See discussion appearing at pages 504–513, *supra*.

NHL but also outside that league, such three year restraint following the expiration of a current contract is unreasonable.[56]

7. Insofar as the aforementioned reserve clause operates to exclude the WHA and its member teams from entering the field of major league professional hockey through the player restraints, it is a violation of Section 2 of the Sherman Act. At this preliminary injunction stage, the Court does not decide whether the NHL's agreements constitute *per se* violations of § 1 of the Sherman Act.

8. There is a clear and substantial likelihood that at trial, the interlocking agreements among the NHL teams, the reserve clause in the Standard Player's Contract, and the agreements between the NHL and the minor and amateur hockey organizations will be found to have given the NHL the power of a monopoly in violation of § 2 of the Sherman Act. Such monopoly power is demonstrated by the NHL's ability to control the supply of professional hockey players, thus precluding effective competition. NHL has exercised such monopoly power in the relevant market.

9. Conduct by the NHL which tends to eliminate competition between actual and/or potential competitors is actionable by players who have been or who are likely to be injured thereby.

10. There is a similar likelihood that, because the NHL and its member teams have consciously entered into the foregoing agreements and have consciously maintained the reserve clause in the Standard Player's Contract for at least 20 years, they have consciously acquired and maintained monopoly power and that such power was not the consequence of superior product, business acumen, or historic accident.

11. Evidence as to the NHL's intent to monopolize has been shown in their maintenance of the reserve clause and the By-Laws and agreements hereinbefore described. The agreements eliminate competition by excluding non-NHL teams from access to the supply of potential and established professional caliber players, the services of whom are vital to the establishment of a major professional hockey league.

12. The NHL may not assert, by way of affirmative defense, the narrow exemption from the antitrust laws created for labor organizations under §§ 6 and 20 of the Clayton Act.

13. The NHL has not shown that the illegality of the reserve clause is excused or immunized by reason of any collective bargaining agreement between the NHL and the National Hockey League Players' Association. The NHL has not shown that they have bargained with the Players' Association concerning the reserve clause, or that the 1972 Arbitration Agreement entered into by the NHL and the Players' Association modifies any preexisting individual Standard Player's Contracts.

14. The WHA and its member teams have demonstrated that they will be immediately irreparably injured by the enforcement of the reserve clause in that they will be deprived of the services of professional caliber players vital to the existence of a major professional league.

15. The former NHL players who have contracted with the WHA for the 1972–73 playing season have demonstrated immediate, irreparable and noncompensable harm to their careers and reputations as major league professional hockey players and/or coaches if no injunctive relief is granted.

16. The balance of hardship absent injunctive relief clearly favors those former NHL players who have contracted with the WHA for the 1972–73 playing season, over the injury which might be sustained by their former NHL clubs.

17. The issuance of a preliminary injunction will maintain the *status quo* until a final adjudication of the merits.

---

56. See discussion appearing at pages 504–513, *supra*.

18. Any Finding of Fact which should also be deemed a Conclusion of Law is incorporated herein by reference.

19. For the foregoing reasons, the Preliminary Injunction should be granted.

## PRELIMINARY INJUNCTION AND ORDER

And now, this 8th day of November, 1972, upon consideration of the depositions, affidavits and documentary evidence submitted by the parties to the Court and because of the Findings of Fact and Conclusions of Law filed in the attached Opinion, it is hereby ordered that the National Hockey League, its member clubs and teams,[57] and those acting on its behalf, are preliminarily enjoined from further prosecuting, commencing, or threatening to commence any legal proceeding pursuant to and/or to enforce the so-called "reserve clause" (presently Paragraph 17) of the National Hockey League Standard Player's Contract, against any player, coach or other person whose contract, but for the reserve clause, expired on or before November 8, 1972.[58]

Wherefore, the motions of the World Hockey Association, its member clubs and teams, and John McKenzie, for preliminary injunction are hereby granted.

This Order shall become effective upon the posting by the World Hockey Association of a bond of two and one half million dollars ($2,500,000.00) with surety approved by the Clerk of this Court.

---

57. On procedural grounds Atlanta Hockey, Inc. and Nassau Sports, a Limited Partnership, owners of NHL teams in Georgia and New York were dismissed from CA 72–1661, see n. 14, *supra.* Thus, as to C.A. 72–1661, this Order is not applicable to those two parties. There is a question of fact as to whether Atlanta and Nassau are actually parties of record in Civil Action 72–1906 (transferred on September 26, 1972 from the United States District Court for the Northern District of Illinois) and Civil Action No. 72–1995 (transferred on October 11, 1972 from the United States District Court for the Central District of California). However, they remain as named defendants in C.A. 72–1906 and counter-defendants in C.A. 72–1807. I reserve my ruling on the issue as to whether this Order is applicable to Atlanta and Nassau because of their membership in NHL and their status in C.A. 72–1906, 72–1995 and 72–1807.

58. For the category of persons to whom this Order is applicable, *see* n. 36, *supra.*